# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Anthony A. Allen,

       Plaintiff,

                                    **Case No. 2:08-CV-00158**

v.                                    **JUDGE SMITH**

                                    **Magistrate Judge Kemp**

Ohio Department of Job
and Family Services, *et al.*,

       Defendants.

## OPINION AND ORDER

Plaintiff Anthony Allen ("Plaintiff") brings this employment action against Defendant the Ohio Department of Job and Family Services ("ODJFS") and Defendant Mark Birnbrich ("Birnbrich"). Plaintiff alleges he suffered various adverse employment actions and retaliation in violation of 29 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) and O.R.C. § 4112.02. Plaintiff further asserts state law breach of contract, promissory estoppel, and intentional infliction of emotional distress claims.

This matter is before the Court pursuant to Defendants' Fed. R. Civ. P. 56 Motion for Summary Judgment (Doc. 30). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 30).

# I.   FACTUAL BACKGROUND

Plaintiff Anthony A. Allen is an African-American male who was employed with Defendant ODJFS from September 13, 1998 until October 20, 2006, when Plaintiff was terminated by Defendant.  Plaintiff is also a veteran of the U.S. Air Force.  He has been promoted to the rank of Lieutenant Colonel, U.S. Air Force Reserves and is assigned and reports to the active duty Air Force.

## A.   Allen's Employment 1998 through 2002

Allen began his employment with ODJFS in September 1998 as an Administrative Assistant 4 ("AA4").  From 1998 through 2001, Allen was directly supervised by John Weber, a Bureau Chief in the Ohio Workforce Development Office ("OWD").  Weber states that he transferred Allen to work under Gerry Cain, an African-American Bureau Chief in OWD at ODJFS because of "consistently insufficient work product." According to Allen, he was transferred to Cain as a result of the Governor's Executive Order that merged the Ohio Bureau of Employment Services with the Ohio Department of Human Services.

Plaintiff Allen was directly supervised by Cain from 2001 through 2002.  Cain believed that Allen was transferred because he was a disruptive, problem employee and had stopped speaking with his supervisor.  While supervising Plaintiff, Cain indicated that Allen was knowledgeable, detail-oriented, and she could count on him to do a job correctly.  She also noticed, however, that he would sometimes attempt to give his work to other people to complete. In addition, she noticed that Allen would sometimes forward phone calls to her instead of answering the questions himself; that he had an attitude; that he would forward emails to people who should not have been privy to them; and that he failed to timely provide her with information

she had requested of him, or would altogether refuse to provide the information to her. In addition, Cain testified that on at least two separate occasions, Allen failed to attend mandatory meetings, and would sometimes "challenge" her with respect to who should perform certain daily tasks. Cain also indicated that on a couple of occasions, Allen was verbally disrespectful in his communication with her. Cain also described Allen's work as fragmented and poor and that he "always had an excuse."

In March 2002, Cain recommended and issued to Allen a 3-day suspension for insubordination. Specifically, Allen was disciplined for: a) consistently failing, even after being issued a corrective counseling, to carbon copy Cain on all correspondence; and b) for failing to complete an assignment in a timely manner and directing Cain to assign it to someone else for completion. Cain testified that Weber urged her to pursue disciplining Allen for these identified behaviors, and told her if she did not, then he might discipline her. She further testified that she "may not have" pursued actual discipline if she had not been urged by Weber.

As a result of the initiation of the pre-disciplinary hearings and investigatory interviews that ultimately resulted in the 3-day suspension, Allen lodged a complaint against Cain with the Federal Defense Logistics Agency. He also separately complained that the work he was assigned to do was not appropriately within his job duties and was, instead, a clerical function.

In May 2002, Cain complained to Bruce Madson, the then-Assistant Deputy of the OWD, that Allen had problems with female supervisors. In response, Allen requested that he be transferred to a different supervisor. Allen complained that he had "to deal with less than optimal working conditions daily" while working under Cain. (Cain Dep., Ex. L).

**B.    Allen's Employment Late 2002 Through 2004**

In late 2002, Allen was assigned to Mark Birnbrich, Assistant Deputy Director for OWD. As an AA4, Allen was to relieve Mr. Birnbrich of his most difficult administrative duties.

Initially, Birnbrich and Allen's relationship was stable.  Birnbrich sent emails to Allen, complimenting him on his hard work.  In February 2003, Birnbrich gave Allen a satisfactory evaluation, which Allen viewed as "decent."  Birnbrich made some very positive comments in the evaluation, although he noted that Allen needed improvement in certain areas.   For the period of time covering this evaluation, Allen had been working as an AA4 on Work Force Development Area 7, where he wrote policies, reviewed financial statements and Department of Labor audits.

**1.    Allen's Assignment to the Ohio Tax Training Credit Program**

In February 2004, Allen was assigned to one of the programs administered through OWD's Bureau of Tax Credits called The Ohio Tax Training Credit Program (hereinafter "OTTC").  The OTTC is a program whereby employers can apply on-line for tax credits for providing training to their employees. The program started in 2001, was defunded in 2002 and 2003, and was funded again in 2004.  Initially, employers applied for tax credits through written applications.  Credits were awarded to employers on a first come, first serve basis.  This structure created an incentive for employers to submit their applications in the first few hours that the program went "live."

Before Allen was assigned to OTTC, Bureau Chief Dwight Garner was responsible for the program.  Garner was a pay range 16 and was also responsible for four other ODJFS programs. In January 2004, when the program went live on-line, it crashed twice because too many employers attempted to submit applications at the same time.  ODJFS Management did not blame

Garner for the crashes.

After the crashes, Birnbrich and Allen were temporarily assigned to the OTTC program.[1] Birnbrich believed that Allen had demonstrated that he had the knowledge and ability to handle OTTC, as Allen had previously assisted with some prior OTTC functions before the crash. Allen disputes that he had prior experience with the OTTC program.

## 2. Assignment to Second Floor Cubicle

In conjunction with his assignment to OTTC, Allen was told he would be assigned a walled-off cubicle on the second floor close to the OTTC staff that he would supervise. This cubicle was occupied by Garner. On the second floor, there was an office fashioned into a conference room, and Garner was offered that office. Garner decided to stay where he was so that the conference room he was offered could continue to be used by his staff as a gathering place. Allen alleges that Garner was given a direct order to move from his cubicle to the conference room, although he did not hear the order. Garner denies being ordered to move, and Birnbrich denies that he made such an order. Allen further alleges that Birnbrich literally said the words "move … or else." Garner did not move, and Allen was given the largest cubicle on the

---

[1] In either late December 2003 or early 2004, Beth Winegar was hired by OWD as the second Assistant Deputy Director over the Bureau of Tax Credits. Prior to this time, Birnbrich functioned as the supervisor in 2003, leaving the Bureau of Tax Credits. Bruce Madson, who had been the second Assistant Deputy Director, was elevated to Deputy Director of OWD Assistant Deputy Director position vacant until it was filled by Winegar. Just before the crash, OWD decided to disband the Bureau of Targeted Services, which meant that certain programs would have to be absorbed into other OWD bureaus. Garner was assigned the additional responsibilities of administering the Refugee and Migrant Seasonal Farmworker programs. In addition, there was a significant backlog of work in the Foreign Labor Certificate program, so it was determined that Garner and Winegar would focus on those programs and that Allen and Birnbrich would temporarily handle OTTC. Allen alleges that Garner was removed due to poor performance.

second floor, near a window.  Allen alleges he "complained of unfair treatment" to Birnbrich.

### 3.     Denial of Temporary Working Level Promotion

On or about February 25, 2004, shortly after being assigned to OTTC, Allen asked for a raise.  Specifically, Allen complained about not receiving proper pay for his new assignment and requested a Temporary Working Level ("TWL") promotion for work that was previously the responsibility of Garner, who was a pay range of 16.  Birnbrich denied Allen's request for a TWL promotion, explaining that since the assignment to OTTC was consistent with Allen's usual AA4 duties, additional compensation was not appropriate.  Allen alleges that this denial was in direct violation of Defendants' workplace rules, policies and procedures regarding employees performing work that was previously assigned to higher classified employees.

### 4.     Denial of Position Description & Complaint of Discriminatory Treatment

In March 2004, Allen requested a position description that outlined his new duties and responsibilities and also for a salary increase.  Birnbrich denied Allen's requests.  Allen alleges that Birnbrich ordered Allen to do the job or face disciplinary action.  Allen further alleges that, after the Birnbrich's denial of his requests, he complained to him regarding discriminatory treatment due to the pay discrepancy and failure to provide proper job description. Allen states that he then contacted ODJFS human resources for a position description, and when Birnbrich learned of this, he directed Allen to refrain from contacting human resources about the new job and ordered him and other OTTC staff not to involve Garner or Winegar regarding the OTTC program.

### 5.     Allen's 1-day Suspension

On March 30, 2004, Winegar requested to meet with Allen and his staff to obtain information regarding problems with the OTTC program. Allen states that he declined to meet with Winegar based upon a direct order from Birnbrich not to involve Garner or Winegar in the daily operations of OTTC. Allen further states that Birnbrich had made it clear that all 2004 customer complaints were to come to Allen or himself only. Birnbrich testified that he does not recall ever directing staff not to speak to a superior, and he could think of no reason why OTTC staff should not talk to Winegar. Birnbrich testified that Allen and other OTTC staff apparently misinterpreted his explanation of the chain of command and his directions that all 2004 customer complaints were to come directly to Allen or himself to mean the staff should not talk to anyone other than Allen or Birnbrich.

Allen received a one-day suspension, effective July 2004 for this incident. Allen alleges that because his refusal to speak to Winegar was in direct compliance with Birnbrich's orders not to involve Garner or Winegar in daily operations, the one-day suspension "was clearly in retaliation for complaining of discrimination and improper treatment." (Allen Aff. ¶ 18).

Defendants explain that there are four discrete steps in ODJFS' typical disciplinary process. According to Defendants, neither Penny Purviance, the Labor Relations Liason for OWD, nor Birnbrich have any control over the final two steps of the process. The first step in the ODJFS disciplinary process is that a supervisor will advise the Labor Liason, in this case Purviance, of perceived misdeeds by an employee. Purviance testified that the usual, but not a required next step, is an investigatory interview, which she conducts. It is in the investigatory interview that an employee has one of two opportunities to present his side of the story. Often, after the investigatory interview, the matter appears to be a misunderstanding or is an issue that

can be corrected with no further disciplinary action. If that is not the case, then Purviance

discusses the issue in her office with other managers and the Deputy. She may then make a

request for discipline that is approved by the Deputy Director. This is not a request for the

imposition of specific discipline, but is a narrative of the events that OWD believes suggest that

there has been a violation of ODJFS policy, requiring the imposition of some discipline.

      The request for discipline is then sent to Labor Relations, who has discretion to initiate

whatever next steps it believes are appropriate. Labor Relations may elect to set up a pre-

disciplinary meeting with the employee. This will provide the employee his second opportunity to

present his side of the story. The employee is notified at least 72 hours in advance of the pre-

disciplinary hearing and is given an explanation of what the employer believes he did wrong. At

this pre-disciplinary meeting, Purviance represents management, and just listens.

      Once evidence is taken from management and the employee, the Labor Relations Hearing

Officer will draft a recommendation. The recommendation will establish which, if any violations

identified by OWD, it believes were founded. The recommendation will then advise whether there

is just cause for discipline. Labor Relations reviews the disciplinary code to determine what is

appropriate. This recommendation is then sent to the ODJFS Director who decides whether to

impose discipline involving suspensions or removals. The Director never solicits OWD's

recommendation for the imposition of specific discipline.

      Consistent with the above-described process, Purviance interviewed Allen about the

Winegar incident. In this meeting, Allen had an initial opportunity to explain the incident from his

perspective. After the interview, Purviance, as is her typical practice, drafted a request for

discipline that communicated to ODJFS' Labor Relations Department that OWD believed Allen

violated policy. Human Resources then conducted a pre-disciplinary hearing, wherein Allen had a second opportunity to explain his side of the story.

After the predisciplinary meeting, Human Resources made a recommendation to the Director as to an appropriate level of discipline. For the insubordination to Winegar, Allen received a one-day suspension.

### 6. Allen's 2003-2004 Evaluation

In May 2004, Allen got another "satisfactory" evaluation from Birnbrich, but he was also rated "below meets" on three goals. This evaluation covered just a few months of Allen's time at OTTC.

Allen alleges that several factors other than his performance led to the "below meets" assessment. First, on May 2, 2004, Allen and another African-American employee, Steve Clayborn, were directed to provide testimony under oath to the ODJFS Chief Inspector regarding an alleged complaint of wrongdoing by Birnbrich that the Ohio Inspector General was investigating. Allen states that Clayborn, too, received a negative evaluation after giving testimony. Though Birnbrich does state or indicate that Birnbrich knew of the complaint or the testimony provided by Allen, Allen speculates that the ODJFS Chief Inspector, Rick O'Claire "knew" Birnbrich, and that their knowledge of one another suggests that Birnbrich would know about Allen's participation in the investigation. Birnbrich disputes that he was aware of the testimony or of any complaints of discrimination made by Allen prior to the 2003-2004 evaluation.

Second, Allen alleges that a letter sent on May 7, 2004 by the Department of Labor to ODJFS caused the "below meets" assessment. The letter related to Allen's USERA charge that

ODJFS had discriminated against him on the basis of his military obligation by suspending him for 3 days in 2002. Allen testified that Birnbrich never mentioned that he was aware of this letter.

Finally, Allen alleges that he was "treated differently than others" in that he was held accountable for 12 months of work during his evaluation period even though he was only there for 8 months due to his military obligation. (Allen Aff. ¶ 22).

In June 2004, Allen appealed his evaluation to Labor Relations, and the appeal was denied. In the appeal of his evaluation, Allen complained that he was not being compensated at the same rate as Garner. Allen made several comments in his appeal regarding Garner's management of OTTC. Allen believed he was making these comments in confidence to Becky Castrano, an employee in Human Resources. Birnbrich, however, learned of these comments, and "raked him over the coals," by telling him not to involve Garner in his evaluation dispute. Allen also complained at this time that he was never given an updated position description that reflected his new assignment to OTTC.

### 7.    August 2004 through December 2004

Defendants, in their Motion for Summary Judgment, reference several instances in late 2004, which they allege demonstrate that Allen "shirk[ed] his responsibility to manage and make decisions for OTTC." (Defs.' Mot. for Summ. J. at 11). The first of these instances relates to Birnbrich's update to the Governor. In 2004, OTTC was still allocating tax credits to the 2001 applicants. By statute, Birnbrich was required to send an update to the Governor regarding how much of the 2001 credits had been distributed to employers. He met with Allen and Borelli in August 2004 to discuss what would go into the update. On September 24, 2004, just before the update was to be submitted on September 30, Allen tendered the update to Birnbrich. Birnbrich

did not think that the update was adequate because it did not include the analysis he asked for from Borelli and Allen in August. The update was sent as is, however, because of the proximity of its due date to the Governor.

Next, Birnbrich alleges that Allen also submitted an inadequate project plan for OTTC after Birnbrich made several specific requests for the plan in the late summer 2004. In early August 2004, Birnbrich specifically requested an update and a project plan for the OTTC 2005 launch. In November 2004, Birnbrich asked for this same information again. Allen alleges that he responded to this email. In December 2004, Birnbrich indicated to Allen again that the information he sought about OTTC was incomplete. Allen defends his submission to Birnbrich in his email response to Birnbrich by concluding that Birnbrich really didn't need the information since it had come in other forms or there had been no change in certain areas.

In November 2004, Birnbrich, in email to Allen, confronted Allen about how he represented the decision-making process to another ODJFS employee:

> (1) In response to your email on 11/22 to John Richards, you make a statement that 'Jeff has got the ball and go no go decisions should be kicked to Mark'….I hope that was just for the meeting you could not attend and not reflection of the 2005 OTTC process. You have been part of the 2005 process for over 9 months and my expectation is that you have the ball and responsibility for the 2005 OTTC process.

(Allen Dep., Ex. Y).

Birnbrich and Borelli testified that in December 2004, just before the OTTC on-line application was to "go live" in January 2005, OTTC employees were so lost about the process that Birnbrich had to step in and give specific assignments to Allen's staff. In addition, though the legislative amendment proposed by Allen was adopted in December 2004 by Governor Taft, Borelli had to substantially rewrite the Ohio Administrative and Revised Code Rules that Allen

had originally drafted to implement the OTTC lottery process.

Defendants also allege that Allen was rude again to Winegar. In December 2004, Allen sent Winegar an email regarding the changes to the Administrative and Revised Code Rules that needed to be entered into a specific database for electronic transmission. His first email to Birnbrich said the rule packages must be entered ASAP. Winegar, who was copied on the email, asked, "What is the time frame for this?" Allen's opening line in response was, "This is an emergency." He then explained that the rules needed to be filed by December 20 and January 3, but did not include any other information about when the packages needed to be entered to make the filing possible. When Winegar asked him for specifics on how much time the office had to prepare for the filings, he told her to call someone else.

Further, Defendants allege that Allen failed to properly monitor and plan for the work time of a key intermittent employee, Linda O'Connor. Defendants explain that State agencies are permitted to hire employees to work on an intermittent basis pursuant to O.R.C. § 124.30, however, the amount of time that an intermittent may work is limited. Linda O'Connor was viewed by Borelli as the creator of OTTC, but in 2004, she was working as an intermittent employee. Birnbrich asked Borelli and Allen to plan for the use of her time so that OTTC got the maximum benefit. In late December 2004, Birnbrich still did not have this information, so he asked for it again. When Birnbrich asked for this information a second time, other concerns had been raised about O'Connor, and Birnbrich shared those with Allen, specifically asking Allen not to share these concerns with anyone else. When Allen responded to the inquiry about O'Connor's time, Allen said he would have to discuss it with Dwight Garner, which was contrary to Birnbrich's wishes of confidentiality. When Birnbrich confronted Allen about this, Allen

complained that he had no access to the time keeping system so he couldn't answer the question about how many more hours O'Connor could work. Allen then provided the "recommendation" for the use of O'Connor's time: her remaining hours could be cancelled or she could continue to work.

**C.     Allen's Employment 2005 through 2006**

On January 25, 2005, Allen emailed ODJFS Director, Barbara Riley, regarding unfair treatment, complaining of Birnbrich and that he did not have a position description.  Riley replied that she asked the Assistant Director and Human Resources to provide information regarding the situation.   Allen did not thereafter hear from Riley.

On January 27, 2005, Allen was transferred back to the operations side of OWD. Birnbrich testified that though Allen had performed certain limited tasks well, including creating the concept for the 2005 lottery, and though he openly praised Allen when he felt Allen had done a good job, the reason for the transfer was that Allen's overall performance was unsatisfactory. Allen states that the rationale for his transfer was not explained to him and that Birnbrich, Demidovich and Purviance had indicated that he had done a good job with OTTC. (Allen Aff. ¶ 27).  Allen states his "good job performance" is further validated by ODJFS's recognition of the success of the OTTC on its list of quarterly accomplishments.

On February 7, 2005, Allen was placed on a Performance Improvement Plan ("PIP"). Defendants allege the PIP was a result of Allen's pervasive problems managing OTTC and that the PIP was instituted to change Allen's behavior and to make him a more successful member of OWD by detailing and outlining specific activities, deliverables, communication protocols, due dates, and project expectations for which Allen was responsible.  The PIP also set forth various

people with whom Allen could consult on each project. Allen alleges that he had not been warned of any performance issues with the OTTC during the year he managed the OTTC program or at any time prior to being placed on the performance plan, nor had he been evaluated with respect to his work in OTC before being placed on the plan. Allen met with Birnbrich and Beverly Flowers, the AA4 for Bill Demidovich, to go over the PIP in detail. During that meeting, Allen maintained that he understood his assignments and the obligations being placed upon him through the PIP. Birnbrich testified that it was made clear that Allen was not to delegate assignments that he was responsible for under the PIP and that he would not be assigned staff to whom he could delegate such responsibilities.

Defendants assert that the original February PIP was updated in July 2005, August 2005, February 2006 and August 2006 because Allen was unwilling or unable to comply with the assignments on the original PIP. Ultimately, the PIP was continued from the date it was issued until Allen's termination in October 2006. Allen alleges that he was subject to the PIP in retaliation for complaining of discrimination. He further alleges that being placed on a continuous PIP for so long contradicts Defendants' work rules and policies. (Pl.'s Memo. in Opp. at 13-14).

### 1. Allen's PIP Assignments

Birnbrich testified that he utilized Allen's weekly summary reports about the status of assigned projects to evaluate Allen's progress and performance under the PIP. He alleges that generally, when Allen met a PIP deadline, the work was of unacceptable quality. Birnbrich states that he regularly notified Allen of these deficiencies, both verbally and through email.

### (a) Allen's OWD Newsletter Project

One of Allen's projects under the PIP was to coordinate OWD's newsletter. In March 2005, a month into Allen's PIP, Birnbrich asked Allen for a draft layout of the newsletter, and Allen responded with a page filled with X's. Birnbrich testified that he had made it clear that he expected more than a form with X's on the page and that he expected Allen to have met with the Bureau Chiefs to get articles. Consequently, Birnbrich directed Allen to set up a schedule of when to meet with Bureau Chiefs.

Allen states that in August 2005, Director Riley sent an email to Deputy Director Demidovich acknowledging staff for the nice job on the OWD Newsletter, which Allen had written. Birnbrich testified that the overall quality of work produced by Allen on the newsletter was sub-par, although a good final product was delivered on at least four occasions with the help of other staff. Birnbrich also states that on at least two occasions, Allen failed or refused to make suggested changes to the newsletter and instead directed staff, including Purviance, to make the changes herself. Finally, Birnbrich alleges that he had issues with Allen representing the newsletter was done when it had not been published, which required Birnbrich to have to follow-up with Allen to ensure that the projected timelines for the newsletter would be met.

      **(b)**     **Allen's SCOTI Help-Desk Survey Project & The Counseling Memorandum**

SCOTI is an online program run by ODJFS allowing employers all over the state to advertise jobs and allowing job-seekers to apply for those jobs. The SCOTI program employs between 10 and 13 employees of various classifications in various pay ranges who answer help-desk calls when employers or job seekers call in with questions.

Under the PIP, Allen was to train himself with the web-based training tool, design a survey for employers and job-seekers that would help OWD understand what about SCOTI did

and did not work for them. Then, Allen was to call 50 employers and 50 job seekers every two weeks to gather enough data to formulate an opinion about the virtues, deficits and possible changes to SCOTI. The purpose of the project was to glean information from employers who had utilized the system, analyze the data provided by them, and make assessments as to the effectiveness of the program.

Allen was the only person assigned to conduct the SCOTI survey. SCOTI staff pulled employer and employee data and provided it to Allen so that he could complete his project. Sometimes, portions of the data that Allen received from the SCOTI staff were incorrect and Allen had to check the data before moving on with his portion of the project. Many times, however, Allen, in frustration that there were, for instance, duplicate employers listed, would simply send the incorrect information back to SCOTI staff and direct them to correct it before he made any calls. He regularly complained that he simply could not make phone calls to employers with "unclean" data that the SCOTI staff had provided to him. Allen was not held accountable for falling below the required number of calls when the data provided to him was incorrect, and he admits that it is possible that Birnbrich moved his due dates forward as a result of the incorrect data being provided to him.

Allen complained that the project was bargaining-unit work and that, in performing such duties, he was working outside of his AA4 classification. Allen did not request a position audit and, to his knowledge, the union did not file a grievance about Allen's performance of these duties. Birnbrich disputes that this project was bargaining unit work, contending that this project involved more than simple data-collection and required Allen to utilize an analytic skill set. Allen also alleges that he had a larger workload then any other AA4 assigned to OWD, and complains

that his requests for help making the phone calls and his requests for authority to delegate were denied. (Compl. ¶ 29).

Defendants assert that Allen refused to perform even the most basic aspects of the SCOTI project and spent a great deal of time crafting excuses as to why he could not do his job, rather than simply performing the tasks assigned. According to Defendants, in August 2005, notwithstanding the fact that Allen had access to employers' database information, he refused to spend the time to review the information prior to contacting employers and instead passed the employers off to local operations for followup. In July 2005, Allen promised a human resources representative from one of the local employers that someone would get back to her before 2 o'clock p.m. Allen then proceeded to email Jim Hill, the OWD Bureau Chief responsible for SCOTI, and told him to call the human resources representative back without first determining if Hill was even in the office that day. In another instance, in conducting his survey, Allen learned through an employer that the quality of applicants through SCOTI was not very good. When he passed this information along to Jim Hill, he was unable to identify a job order number to permit Hill to access the appropriate record. When confronted, Allen indicated he did not work in SCOTI, that he was not responsible to "chase down job orders," and blamed SCOTI for the lack of information.

Defendants assert that in December 2005, Allen complained that "cleaning" the records was taking too long, that "cleaning" records was a task that should be assigned to SCOTI staff, and that he was unable to do his job when the SCOTI staff provided him with erroneous information. When Birnbrich directed him to begin calling those employers for whom he had "cleaned" records, Allen again complained that he was the only person being assigned to make the

calls and that the task was outside his job classification and should be performed by SCOTI staff. Allen indicated in a December 2005 email to Birnbrich that the performance issues raised by Birnbrich were "not a matter of performance, but of [Allen's] race." (Allen Dep., Ex. IIII). He also stated: "This is another example of ongoing, harassment, threats and retaliation that is initiated by you and management." (*Id.*)

In addition, Allen emailed Birnbrich and Weber, indicating his belief that the SCOTI project was a waste of time. Birnbrich asked Allen to come up with solutions for getting referrals to show up, ways to track who shows up and who gets hired, and ways to track the quality of referrals. Allen proposed a plan to set up an automated survey system using an autodialer whereby employers and job-seekers would be auto-dialed and asked automated questions. Birnbrich expressed concern for this approach since, in his experience, the auto caller feature had no mechanism by which the person receiving the case could respond to questions. Allen also suggested calling job seekers as a means of establishing whether they were quality referrals. Birnbrich questioned this approach since the original inquiry was to gauge whether the employers felt they were getting quality SCOTI referrals.

Allen, in response to these issues, wrote back to Birnbrich: "you are unwilling to accept my work and continue to treat me significantly different from others for obvious reasons. What's the basis of the ongoing harassment? Everyday, that I come into work, I have to defend myself." (Allen Dep. 429; Ex. QQQQ). Allen forwarded this email to ODJFS Director Barbara Riley.

On March 16, 2006, Bill Demidovich, OWD Deputy Director, held a counseling session with Allen regarding his response. He told Allen to answer Birnbrich's questions and to apologize for being insubordinate. He was asked to sign a "Counseling Memorandum." The

Memorandum references Allen's email and concludes the email was unacceptable and insubordinate. (Allen Dep., Ex. TTTT). Demidovich concludes in the Memorandum that Birnbrich was not treating Allen "any differently nor harassing [Allen] by asking questions of clarification." (*Id.*). The Memorandum issues a reminder to Allen that he is "still under a direct order from [Demidovich] last year to get your work done." (*Id.*). Finally, the "Actions" section of the Memorandum provides:

> -Stop the bantering back and forth with your immediate supervisor and do your work.
> -You are to send an e-mail of apology to Mr. Birnbrich immediately.
> -You are to provide a responsive answer to Mr. Birnbrich's e-mails.
> -Again, I consider this behavior insubordinate and if it continues I will forward to HR for disciplinary action.
> -Today will be noted as a counseling
> -Mr. Birnbrich will be notified of this meeting.

(*Id.*). Allen interprets this language as providing him with "a direct order to stop complaining about discrimination." (Pl.'s Memo. in Opp. at 20). Allen alleges that he did respond to Birnbrich's questions, though he could not say when and does not have evidence of any written response. Demidovich also asked Allen to sign the Counseling Memorandum memorializing the session.

### (c)    Allen's Submissions of Weekly Reports

Allen was required to submit weekly reports to Birnbrich so that Birnbrich could assess Allen's progress on his PIP. One purpose of the "weeklies" was to provide Allen an opportunity to ask questions, indicate problems he was having, and get clarification from Birnbrich. Defendants assert that Allen failed to report specific problems and instead simply complained of being unable to perform tasks. Defendants also assert that Allen would misstate the status of his projects on his weeklies and would also fail to respond to substantive questions posed by

Birnbrich regarding his projects.

### (d)     Allen's OWD Tracking Reports

One of Allen's responsibilities was to organize a calendar that would track all of the reports OWD had due in a year. The Bureau Chiefs were to identify which reports were to be tracked, and Allen was to maintain communication with the Bureau Chiefs, create a policy for reviewing and tracking the reports, and then track them.

Allen was also assigned the responsibility for reviewing the reports. Allen agreed that this project may have been appropriate for his classification as an AA4. Defendants assert that Allen's suggested report tracking method was impossible to implement, and his emails created confusion and the need for clarification and follow-up. On one occasion, Allen imposed a deadline upon Bureau Chiefs for the submission of certain reports to the Deputy's office without first discussing the deadline or its implications with the Bureau Chiefs. Defendants assert that this imposition of additional deadlines on Bureau Chiefs, without any prior discussion, created problems, rather than eliminating them.

Defendants note that on at least one occasion, Bureau Chiefs expressed their confusion about their role in the project, as well as the project's direction, requiring Birnbrich to sort the matter out. Allen recalled being "called to the carpet" for submitting a report late. Allen defends the delay by stating that he did not have the expertise to evaluate data provided to him and to determine if it was correct.

### (e)     Allen's Revision of the OWD Website

Allen was also tasked with the responsibility for revising the OWD website and for coordinating with Bureau Chiefs about organizing each bureau's information. This is a project for

which Allen was responsible before his PIP. Defendants allege that he inadequately performed

this task. In support of this allegation, Defendants cite Allen's repeated lack of communication

with Bureau Chiefs on this project, claiming it created confusion and resulted in necessary

followup by Birnbrich. Specifically, Defendants assert that on one occasion, Allen solicited

comment from Bureau Chief John Weber about the information for Weber's bureau to be included

on the website, and in response, Weber expressed confusion about the kind of commentary Allen

was requesting and indicated that, based upon what Allen provided, "there is not much to work

with." Several months later, in July 2005, Allen sent an email to Bureau Chiefs indicating to them

that the OWD website was completed "a month ahead of schedule" and is now "live." Garner

responded to Allen's email noting that Allen had selected the wrong link for a program

administered by his bureau and said he was "not sure where that came from." In the same email,

Garner asked Allen to explain why the OWD website (the internal website) would not be part of

the ohioworkforce.org website (the external website). Allen did not answer Garner's question,

responding "it was originally recommended" that the internal site be part of the external site.

During the internal investigation of this incident in August 2005, in conjunction with other issues,

Garner indicated that only after speaking with Birnbrich did he finally get his question answered.


Allen disputes the assertion that his performance was inadequate, and references accolades

he received from Garner indicating that the "web pages looked very nice" and from John Savage

stating "good job, Tony . . . Also, that website is OK"; and from Joseph Andrew stating "nice job

to you and those that worked on the website. Thanks." (Pl.'s Memo. in Opp. at 15, citing

Birnbrich Dep. Exs. 29, 30).

### (f)     The Vets Limited Funds Policy Project

In February 2006, Birnbrich assigned Allen to conduct a policy review of the Vets Limited Funds Policy ("VLFP") and prepare a discussion paper about his review. The drafting of the VLFP had previously been assigned to other staff, but was given to Allen because the other staff had too much work to do.  Allen was assigned to work with John Weber on this project.  In April 2006, Weber sent Allen an email that explicitly described what he expected from Allen. Weber mentioned that Birnbrich had approved the actions developed by Weber, and directed Allen to "draft language for the revision of the WIA Guidance Letter."  Weber appeared to use the language "guidance" and "policy" interchangeably.

Allen provided "draft language" for use by Weber's staff when they wrote the policy. When Weber got the "draft language," he informed Allen that what was submitted was inadequate.  Allen complained to Birnbrich that he was never clear that he had to actually write the policy, which he understood to be something different than the "guidance" he provided.  He also complained about having to do someone else's work.  Birnbrich responded: "you are aware that we have had difficulty filling the positions in this area . . . please keep in mind that it is not your responsibility to determine what or who's job it is on projects . . . ." (Allen Dep. Ex. ZZZZ).

Defendants allege that Allen never put together an acceptable policy, causing Weber to enlist the help of another.  Birnbrich cited the failure on this project in Allen's 2005-2006 annual evaluation.

### (g)     The Workforce Services Month Project

During Workforce Services Month ("WSM"), county one-stop agencies offer job fairs and other employment-related activities to the public. ODJFS processes county applications for funds

to conduct these activities. The first WSM was held in September 2005 and was coordinated by Robin Rice, a white female, Program Administrator 1.  WSM was successful and well-received by the Governor's office.

On July 6, 2006, in Allen's annual evaluation, Birnbrich identified WSM as a goal, with an initial process plan for the acceptance of applications due by July 12, and an overall plan for the whole event by July 17.  On July 12, Allen submitted a plan that Birnbrich concluded "does not address what is listed in your goals/perf eval that is due by 7/12. What is requested by 7/12 is about the process and communication flow. What you have submitted is start to the 7/17 deliverable." (Birnbrich Aff. ¶¶ 7, 8; Exh. A). On July 25, 2006, Birnbrich wrote:

> We have had many emails and verbal conversations regarding the WSM process plan…even the latest being after our meeting this morning. I like what I see and direction it appears to be headed, however, I still need the WSM process plan as originally due on 7/12.  The process plan is still extremely important to the overall plan. This morning I just received additional WSM requests (outside our verbal discussion process) . . . .

(Allen Dep. Ex. CCCC).  Birnbrich asked for the process plan by close of business that day. Defendant Birnbrich states he was seeking a detailed analysis of who would get the applications and how they would be processed once received. (Birnbrich Aff. ¶ 7). Allen provided a 5-step process, but Birnbrich indicated that this process lacked certain pieces, including where the One-Stop local offices and where ODJFS employees fit into the process. (Allen Dep. Exh. CCCC). Allen responded, "I've done the best that I could on this. I'm sorry that you're unwilling to accept my work." (Birnbrich Aff. ¶ 8, Exhibit B).

As a result of this dispute, Deputy Director of OWD William Demidovich got involved. He met with Allen and Birnbrich and had Birnbrich explain what he expected.  After the explanation, Demidovich asked Allen if Allen could now complete the process plan. Allen refused.

Demidovich then ordered Birnbrich to complete the application process plan and directed Allen to incorporate Birnbrich's process plan into the overall WSM process plan.

Defendants also allege that as a part of WSM, Allen was expected to train OWD staff on the process plan, and his failure to do so caused several problems with WSM. Allen contests this characterization and asserts that he did a "superb job" managing the WSM project as demonstrated by the accolades from staff and county directors. (Pl.'s Memo. in Opp. at 27). Allen further asserts that he did, in fact, train OWD staff on the process plan.

### 2. Allen's 2004-2005 Evaluation and Appeal

In May 2005, Birnbrich evaluated Allen's performance between May 2004 and May 2005 as "unsatisfactory." Allen was rated as "below target" on the performance of his PIP. The evaluation covered the eight months Allen had been temporarily assigned to OTTC and four months since Allen had returned to the operations side of OWD.

Allen received two "does not meet" ratings in the areas of problem solving, decision-making and communication/teamwork. Birnbrich reviewed the performance evaluation with Allen in May 2005. The evaluation addressed Allen's performance in 2004, which led to the imposition of the PIP, as well as Allen's recent performance. Defendants allege that Allen's performance back on the operations side of OWD was unsatisfactory because he failed to follow the performance plan and the assigned activities and duties outlined on it. Defendants further allege that Allen had poor judgment in the performance of those assigned activities and failed to meet assigned due-dates, and finally, that he spoke with individuals with whom he did not need to consult to complete his projects. Allen disputes that he had performance issues and instead asserts that he was "an excellent employee" and that he "did extremely well while managing the

24

OTTC Program, as well as in other areas in which he worked." (Pl.'s Memo. in Opp. at 12).

On May 25, 2005, Allen internally appealed the 2004-2005 Evaluation. Allen's appeal was denied on June 6, 2005. On June 9, 2005, Allen appealed that decision and was again denied. Allen then appealed his performance evaluation to the Ohio Department of Administrative Services ("ODAS"). ODAS determined that the evaluation would stand as issued.

### 3. Allen is Denied a TWL

On January 1, 2006, Allen was denied a TWL to replace Garner in the Bureau of Tax Credits. Allen alleges that he was more qualified than the successful applicant, Alice Worrell, who was a Caucasian female who worked part-time as an Administrative 4. Specifically, Allen states the time he spent in charge of the OTTC program made him more qualified. Defendants dispute that Allen was more qualified, and Demidovich, in his Affidavit, sets forth Ms. Worrell's qualifications. He further states that Allen was not considered because he "had active discipline on file, poor performance evaluations and was on a performance plan due to poor performance . . . ." (Demidovich Aff.).

### 4. Allen's February & September 2006 Military Duty

On February 2, 2006, two days before Allen was to report for military duties at the Pentagon, Allen was told to go home and return before the close of business with the name and telephone number of his Commander. Allen states that he was told that if he did not do so, he would be terminated. Plaintiff alleges that other ODJFS employees who are members of the National Guard/Reserves are not asked to provide the names and numbers of their commanders.

On February 6, 2006, while Allen was on military leave, Demidovich, Birnbrich and Purviance called Allen's Commander. Allen asserts that there was no legitimate business reason

for their phone call, and alleges that prior to filing complaints of discrimination, his military commander was not called. (Pl.'s Memo. in Opp. at 19, citing Allen Dep. 510). Demidovich states that the phone call was made to establish contact with Allen's Commander and to obtain verification of Allen's duty assignment upon completion for ODJFS records since Allen's leave was with pay. (Allen Aff. at Ex. 1J, Demidovich Aff.).

According to Allen, on August 8, 2006, after he notified Birnbrich of military duty effective September 5 though 27, 2006, Birbrich threatened Allen with termination for requesting military leave. Allen also alleges that Anthony Augello, on behalf of ODJFS, called and spoke with his Commander's Executive Officer about his military leave and the need for Allen in the ODJFS office. Allen contends that this call was an attempt by ODJFS to harass and interfere with his military career and to deny him his military leave. (Pl.'s Memo. in Opp. at 29).

### 5. Investigatory Interview, Pre-Disciplinary Hearings & Suspension

On August 25, 2005, Allen was investigated based on two emails he sent. The first email was sent to Garner on July 25, 2005. Allen represented to Birnbrich that the July 25, 2005 email answered a question Garner had, and Birnbrich alleges that his follow-up with Garner revealed Allen's representation was untrue, that Garner remained confused. In the investigatory review, Garner indicated that Birnbrich, not Allen's email, remedied his confusion.

The second email prompting the investigation was sent by Allen to all OWD Bureau Chiefs on August 2, 2005. The email directed the Bureau Chiefs to respond to his inquiries, whether they were written or oral, in writing. According to Defendants, several Bureau Chiefs contacted Birnbrich, complaining that they now had to communicate in writing to Allen about everything. Birnbrich then emailed Allen, telling him it was inappropriate to direct Bureau Chiefs

to communicate with him in writing and instructing him to contact Bureau Chiefs to clarify the email. Defendants allege that follow-up by Birnbrich revealed that three out of five Bureau Chiefs were still confused as to Allen's directive. Allen states that Garner confirmed the Bureau Chiefs were not confused and approved the website, and therefore, Allen contends there was no legitimate business reason to investigate him. (Allen Aff. ¶ 33).

This matter was investigated by Purviance, and ultimately a pre-disciplinary meeting was set. The pre-disciplinary meeting for this incident was scheduled to be held on September 13, 2005. On September 8, 2005, Aleta Guilford, ODJFS human resources employee, contacted Allen about picking up the pre-disciplinary packet. Later that day, Pamela Rumbaugh-Fisher, another ODJFS human resources employee, contacted Purviance to notify her that, per agency policy, employees must be given a three-day notice prior to the actual pre-disciplinary hearing. Allen was unaware of the notification requirement and disputed that such requirement exists. Since Allen's predisciplinary hearing was scheduled for September 13, 2005, Purviance was given a direct order by Deputy Director William Demidovich to order Allen to pick up the pre-disciplinary package that day. Allen alleges that he was ordered to pick up the pre-disciplinary package from Human Resources that day or he would be terminated.

The pre-disciplinary meeting was continued to February 21, 2006. Defendants allege the continuance was because between the time that the pre-disciplinary meeting was held and the Labor Relations Officer's report was written, OWD identified what it believed were other rule violations by Allen. Allen alleges this delay is in violation of agency policy. (Compl. ¶ 28). He further alleges that the delay was upsetting to him because the matter was held over his head for an unnecessarily long period. (Allen Aff. ¶ 17).

In December 2005, Plaintiff emailed ODJFS Director, Barbara Riley, about discrimination he alleges he was subjected to in OWD. (Compl. ¶ 32).

On February 21, 2006, the day the pre-disciplinary meeting as to be held, Allen called in sick. According to Defendants, Allen was directed by Birnbrich, pursuant to ODJFS policy and at the order of Human Resources, to secure a doctor's verification of his illness. Allen alleges this was in violation of ODJFS policy. The pre-disciplinary hearing was held on February 23, 2006. Defendants allege that Allen refused to answer any questions or otherwise participate in the meeting.

A second pre-disciplinary hearing was held on March 27, 2006, wherein the Counseling Memorandum was addressed. According to Allen, he was entitled to but denied legal counsel at the hearing. Allen further alleges he was not given the opportunity to question witnesses during the hearing. Deborah Connelly, a Labor Relations Department Hearing Officer, conducted both hearings. She issued a pre-disciplinary memorandum in which she generally found that Allen failed to carry out work orders, refused to cooperate in the investigation and was insubordinate. Ms. Connelly found just cause to discipline Allen and prepared a report about the two meetings, sending the report to Director Riley. Director Riley gave Allen a ten-day suspension, without pay, effective June 5 though June 16, 2006.

Plaintiff states that he was placed on physicians orders not to return to work for 2 weeks, effective May 22 through June 2, 2006 due to mental stress and physical harm resulting from the alleged discrimination, retaliation and harassment.

### 6.    Allen's Alleged Leak of Internal Communications

Since 2004, Birnbrich repeatedly instructed Allen not to send his internal emails to outside

entities. On August 9, 2006, Allen copied Patricia Garrison, the Executive Director of Area 7 on internal communications. (Allen Dep., Ex. HHHHH). In the email correspondence, Garrison specifically states "Tony did copy in my office and called me regarding budget changes." (*Id.*). Garrison also noted in her email that she sensed "reservations coming from [Birnbrich]," and Birnbrich responded by explaining: "Regarding my reservations, this is an internal matter and should remain as such." (*Id.*).

### 7. Allen's August 2006 PIP & Alleged Threats

On July 7, 2006, Allen received an unsatisfactory annual performance evaluation. Plaintiff, citing racism and discrimination, signed the evaluation under protest.

On August 9, 2006, Allen's performance plan was continued or renewed. Allen alleges he was threatened by Birnbrich and Purviance "to sign the performance plan or else," but that he refused to sign it. (Pl.'s Memo. in Opp. at 27). Allen testified that he did not sign it because he "didn't feel comfortable signing it," though he could not explain why he did not feel comfortable signing it. (Allen Dep. 349-50). Allen further testified that Birnbrich told him on August 9, 2006, that he was going to continue his treatment of him until he stopped filing charges of discrimination and dropped his charges. (*Id.* at 354-55).

Allen alleges that on August 18, 2006, Birnbrich "startled" him by throwing the August 2006 PIP on his desk. (Allen Aff. ¶ 64). Allen further alleges that when he again refused, Birnbrich returned with Winegar and said "this is your last chance." (Allen Dep. at 357). Allen continued to refuse to sign the performance plan.

### D. Allen's Termination

According to Defendants, Allen was terminated on October 20, 2006, due to issues with

his job performance, including issues with WSM, customer leaks, failure to create an acceptable process plan and general failure to meet the expectations of his PIP and also because of his unwillingness to accept direction, defiant behavior and repeated failure to carry out and follow directions. Allen alleges that his termination was improper because his PIP was not due to expire until February 2007, yet he was terminated 4 months prior to the time he was given to improve his performance. (Pls.' Memo. in Opp. at 14). He further disputes that he had job performance issues.

**E.      Allen's Formal Complaints of Discrimination**

Throughout the course of his employment, in addition to informally complaining to his supervisors numerous times of discrimination and harassment, Allen made several formal complaints of discrimination and retaliation, including two internal complaints of discrimination and nine charges of discrimination filed with OCRC. Allen's supervisors took part in responding to his OCRC charges of discrimination and were therefore aware of those charges.

On October 1, 2004, Allen filed a complaint with the Ohio Department of Administrative Services, alleging discrimination and retaliation. Specifically, Allen alleged he had been denied supervisory and management authority in that the table of organization did not reflect his status as a supervisor/manager of the OTTC program and that he was denied access to timekeep to approve schedules and manage staff time. Additionally, in the complaint, he complains of the alleged incident wherein Garner did not leave his office against an alleged order to do so. He states: "[i]t appears that I was retaliated against for asking about a raise . . . ." (Allen Dep., Ex. BB). He also states that "[a]nother example of disparate treatment is in regard to the evaluation he was directed to write on Jeff Borelli." (*Id*.). Allen explains that he had to write an evaluation

for Borelli even though Borelli only worked for him for about 45 days, and yet Garner was not disciplined for failing to write an evaluation for Borelli in the previous year. Allen further alleges he was "retaliated against for appealing the evaluation." (*Id*.). Finally, he alleges that he was "being retaliated against by Mark Birnbrich for warning not to get involved with a sole source contract to MAXIMUS a vendor that was already doing business with the state. (*Id*.). He concludes in the complaint that "[t]he work situation has gotten progressively hostile."

On April 6, 2005, Allen filed another complaint with the Department of Administrative Services, alleging discrimination and retaliation. Specifically, he alleged that on March 2, 2005, he was put on a performance plan even though he did a good job with OTTC. He indicates that he believes the discrimination is based upon his race, gender, age and military status. In addition, he alleges he was retaliated against for providing testimony on behalf of a co-worker in the course of an EOD investigation. (Allen Dep., Ex. DDDDD).

On June 1, 2005, Allen filed a his initial complaint with the Ohio Civil Rights Commission ("OCRC") and Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and adverse employment actions and retaliation for complaining about discrimination.

On September 12, 2005, Allen filed his second complaint of discrimination and retaliation with the OCRC. Allen alleged that Defendant ODJFS has subjected him to an investigatory interview and pre-disciplinary meeting because of his race and in retaliation for his filing previous charges of discrimination.

On March 22, 2006, Allen filed his third complaint of discrimination and retaliation with the OCRC. Allen alleged discrimination based upon the following alleged incidents: (1) denial of TWL; (2) January 31, 2006 attempt of intimidation of witnesses; (3) February 2, 2006 threats of

termination and interrogation; (4) February 4, 2006 call from his supervisors to his military commander to slander and discredit him; (5) February 21, 2006 call to Plaintiff, directing him to see a physician and provide a medical diagnosis for taking 1 day of sick leave; and (6) February 23, 2006 order to Allen to participate in another pre-disciplinary meeting and denial of legal representation at the meeting. (Allen Dep., Ex. FFFFF). Allen concludes that he was "harassed daily for filing charges with OCRC . . . ." (*Id.*).

On May 25, 2006, Allen filed his fourth charge of discrimination and retaliation with the OCRC, alleging that the 10-day suspension and threats of suspension and removal were unjustified and retaliatory for refusing to drop his charges of discrimination and retaliation. (Allen Dep., Ex. WWWW).

On July 11, 2006, Allen filed his fifth charge of discrimination with the OCRC, alleging that he was directed to perform duties and responsibilities that were previously assigned to a program policy staffer and a bureau chief who was not in his reporting chain.

On August 25, 2008, Allen filed his sixth, seventh and eighth charges of discrimination with the OCRC, alleging discrimination based upon the following alleged incidents: (1) "derogatory" annual performance evaluation (Allen Dep., Ex. QQQ); (2) placement on another performance plan; (3) threats of termination for failure to sign the plan; and (4) interference with his military service by calling his commanding officers.

On November 3, 2006, Allen filed his ninth charge of discrimination, alleging he had been terminated based upon his race, military status and in retaliation for previously filing charges of discrimination. (Allen Dep., Ex. GGGGG).

The OCRC found probable cause that discrimination had occurred. On November 28,

2007, the Equal Employment Opportunity Commission ("EEOC") issued nine Right to Sue Letters.

**F.    The Instant Action**

On February 20, 2008, Plaintiff filed the present action, alleging he suffered various adverse employment actions and retaliation in violation of 29 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) and O.R.C. § 4112.02.  Plaintiff further asserts state law breach of contract, promissory estoppel, and intentional infliction of emotional distress claims. On April 6, 2009, Defendants filed a Motion for Summary Judgment, seeking judgment in their favor on all claims. (Doc. 30).  This motion has been fully briefed and is ripe for review.

## II.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the non-moving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2] The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the non-moving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the non-moving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary

---

[2] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the non-moving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

judgment.'" *Id.,* quoting *Liberty Lobby*, 477 U.S. at 257. The non-moving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the non-moving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.,* quoting *Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the non-moving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d at 665.

## III. DISCUSSION

Plaintiff Allen asserts the following employment discrimination claims, pursuant to Title VII of the Civil Rights Act of 1964, § 1981 and Ohio Revised Code § 4112.02: (1) disparate treatment race discrimination, (2) retaliatory harassment, and (3) retaliation for engaging in conduct protected by Title VII. (Compl. ¶¶ 75-79). In addition, Plaintiff asserts several state law claims, including claims for: wrongful discharge, breach of implied contract, promissory estoppel and intentional infliction of emotional distress. (Compl. ¶¶ 80-91). Defendants move for summary judgment on all claims. The Court first addresses Allen's employment discrimination claims, and next, his state law claims.

**A.      Allen's Employment Discrimination and Retaliation Claims**

Allen asserts he was the victim of employment discrimination in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 1981 and Ohio Revised Code Chapter 4112.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1).

Employment discrimination is also prohibited by 42 U.S.C. § 1981(a), which states in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." The United States Supreme Court acknowledged the "necessary overlap" between Title VII and § 1981, but noted that the "remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1953 (2008), quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 461 (1975). For example, Title VII provides for administrative remedies. *Id.* In *CBOCS West, Inc.*, the Supreme Court held that § 1981 applies to retaliation claims. *CBOCS West, Inc.* 128 S.Ct. at 1953. In considering employment discrimination and retaliation claims brought pursuant to § 1981, the Court utilizes the same analytical framework applied to claims under Title VII. *See, e.g., Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003); and *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n. 2 (6th Cir.2000).

Likewise, in analyzing employment discrimination and retaliation claims brought under Ohio Revised Code Chapter 4112, the Court utilizes the same analytical framework applied to claims under Title VII. *See Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 575 N.E.2d 1164, 1167 (1991); *Plumbers and Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 66 Ohio St.2d 192, 196 (1981) (holding that the Ohio Supreme Court, in considering employment discrimination claims under Ohio Revised Code

Chapter 4112, adopts the tests established by the federal courts for assessing claims under parallel anti-discrimination statutes).

As a preliminary matter, Defendants contend that some of Plaintiff's employment discrimination claims are time-barred. A Title VII Plaintiff is required by § 2000e-5(e)(1) to file his charges of unlawful practices with the EEOC within 300 days. *EEOC v. Ford Motor Credit Co.*, 26 F.3d 44 (6th Cir. 1994). For purposes of determining whether a Title VII plaintiff has complied with statutory time limitations, the U.S. Supreme Court, in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), has drawn a distinction between discrete discriminatory acts and a series of separate acts that collectively constitute a hostile work environment. After analyzing the nature of hostile work environment claims, the *Morgan* Court concluded that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside of the statutory time period. *Provided that an act contributing to the claim occurs within the filing period*, the entire period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* at 117 (emphasis added).

Thus, based upon *Morgan*, this Court, in assessing the merits of Allen's alleged hostile environment claim, will consider *all* of the alleged incidents of harassment, including those that occurred outside of the statutory filing period**,** *provided that an act contributing to the hostile work environment claim occurs within the filing period*. The required "act contributing to the claim" need not be actionable on its own. *Id*. at 115, *citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Here, Allen's hostile work environment claim is timely because he filed his charge within 300 days of an act that is part of the alleged hostile work environment (for example, the alleged August 2006 incident in which Birnbrich threw Allen's PIP on his desk and threatened

him with termination if he failed to sign it).

Two of Allen's disparate treatment claims, however, are untimely under Title VII—his disparate treatment claim based upon his 2004 evaluation and his 2004 denial of TWL pay adjustment. Allen first indicated that his 2004 evaluation was discriminatory in 2008, in the instant filing, and he did not file a charge challenging the 2004 denial of TWL pay until 2005, more than 300 days after the occurrence of the incident.

Though time-barred under Title VII, Allen can rely on § 1981 to bring these two claims. Like many federal statutes, 42 U.S.C. § 1981 does not contain a statute of limitations. In *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004), the United States Supreme Court held that the appropriate statute of limitations for claims raised under § 1981 is four years. Thus, the claims are not untimely under § 1981.

### 1.     Allen's Race Discrimination Disparate Treatment Claims

Plaintiff alleges the following instances of disparate treatment based upon his race: (1) 2004 denial of TWL pay adjustment; (2) 2006 denial of TWL promotion; (3) one-day suspension; (4) ten-day suspension; (5) poor evaluations in 2004 and in 2005; (6) continuous PIPs; and (7) termination. (Pl.'s Memo. in Opp. at 5). Defendants maintain they are entitled to judgment in their favor on each of these alleged disparate treatment claims. The Court agrees.

In order to prevail in an employment discrimination disparate treatment claim, a plaintiff must either present direct evidence of discrimination or rely upon the burden-shifting scheme set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to create an inference of discrimination. *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 402 (6th Cir.

1999). Plaintiff, in his Memorandum in Opposition, fails to offer direct evidence of race discrimination, stating "Plaintiff proceeds in the instant case under the *McDonnell Douglas* burden-shifting paradigm." (Pl.'s Memo. in Opp. at 34).

To establish a *prima facie* case of employment discrimination based on race, a plaintiff must present circumstantial evidence demonstrating the following elements: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp.*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *See Id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden returns to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See Id.*; *Burdine*, 450 U.S. at 253. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 253. This burden-shifting framework is intended to be flexible in differing factual circumstances. *See e.g.*, *Christian v. Wal-Mart Stores, Inc,*. 252 F.3d 862, *869-70 (6th Cir. 2001), citing *Burdine,* 450 U.S. at 254 n. 6.

In the instant case, Defendants contend that Plaintiff fails to establish a *prima facie* case of discrimination for each his alleged claims. The Court considers each alleged claim in turn.

###### (a)  2004 Denial of TWL Pay Adjustment

For each of Allen's disparate treatment claims, it is undisputed that Allen, as an African-American, is a member of a protected class. Further, Defendants do not dispute that the 2004 denial of TWL pay adjustment constitutes an adverse action. Instead, Defendants maintain that Allen fails to establish a *prima facie* case of discrimination with respect to this claim because (1) he was not qualified or entitled to a TWL pay adjustment; and (2) he cannot identify similarly situated individuals who were treated more favorably. Finally, Defendants assert that they are entitled to summary judgment on this claim because they have asserted a legitimate, nondiscriminatory justification for denying the pay adjustment, and Allen cannot demonstrate that the proffered reason is a pretext for discrimination.

###### i.  Qualified

Allen argues that his assignment to the OTTC in February 25, 2004 made him eligible for a TWL raise. Specifically, Allen contends that because Bureau Chief Garner managed the OTTC Program prior to him, and because Garner is at a higher pay range, he is entitled to the TWL pay increase.[3] Allen cites to Ohio Administrative Code § 123: 1-37-07(A) for support. Birnbrich denied Allen's request for a TWL promotion, explaining that since the assignment to OTTC was consistent with Allen's usual AA4 duties, additional compensation was not appropriate. Additionally, Defendants assert that § 123: 1-37-07(A) requires a vacancy, and thus, Allen was

---

[3]Defendants assert that before Allen was transferred to OTTC, the program was managed by Borelli who was at an even lower pay range than Allen. Allen disputes this assertion, claiming instead that the OTTC program was previously managed by Garner, who was at a higher pay range. The resolution of this dispute is immaterial to the Court's ruling on whether Allen qualified to receive a TWL pay adjustment in 2004, and at this stage of the litigation, the facts are viewed in a light most favorable to Allen.

not entitled to a pay increase because he was not "filling a vacancy."

Ohio Administrative Code § 123: 1-37-07(A) provides:

Each employee that is temporarily assigned to duties of a position with a higher pay range than is the employee's own, shall be eligible for a working level pay adjustment. This pay adjustment shall increase the employee's base rate of compensation to a rate of pay approximately four percent above the employee's current base rate of compensation. This pay adjustment shall in no way affect any other pay supplement, which shall be calculated using the employee's normal classification salary base.

This working level adjustment shall be for a continuous period in excess of two weeks, but not more than two years *as a result of a vacancy*.

(emphasis added). Read in its entirety, this provision contemplates rewarding employees with higher compensation who temporarily fill a vacancy of a higher pay range employee by undertaking the duties associated with the vacant position. O.R.C. § 124.181(J) clears up any ambiguity with respect to the requirement that a vacancy must exist before a TWL adjustment can be awarded:

Whenever an employee is assigned to work in a higher level *position* for a continuous period of more than two weeks but no more than two years *because of a vacancy*, the employee's pay may be established at a rate that is approximately four percent above the employee's current base rate for the period the employee occupies the position, provided that his temporary occupancy is approved by the director.

(emphasis added).

As Defendants point out, Allen did not fill a vacancy—he did not take over Garner's role as Bureau Chief, and Garner remained in his position as Bureau Chief. Nor did Allen perform the duties of a position with a higher pay range—he was not managing multiple programs as a Bureau Chief does or responsible for the bureau's budget and personnel matters as a Bureau Chief is. (*See* Pl.'s Memo. in Opp. at 5, admitting that in addition to the OTTC program, Garner was "also

responsible for other areas under OWD"; *see also,* Demidovich Aff. ¶ 1, stating "Mr. Allen did

not perform the duties and responsibilities of Chief of the Bureau of Tax Credits during my

tenure"; and Garner Dep. 17-18, 24-25). Instead, Allen managed just one program within the

Bureau of Tax Credits, and the duties he performed were consistent with those of an AA4. (*See*

Allen Dep., Ex. E, Position Description, Administrative Assistant 4: " . . . acting for & relieving

Assistant Deputy Director of Services of most difficult administrative duties . . . provides regular

direction to bureau/section chiefs & other staff on program operations . . . ."; *see also*,

12/23/2005 email from Allen to Riley, referencing that his position is an AA4, and stating that

"consistent with [his] position description and job title, I supervise and direct staff . . . ." Riley

Aff., Ex. B). Accordingly, the Court agrees with Defendants, that Allen cannot state a *prima*

*facie* case with respect to this claim because he has failed to demonstrate that his assignment to

OTTC qualified him for a TWL pay adjustment.


### ii.      Similarly Situated

As an additional basis for finding that Allen has failed to state a *prima facie* case with

respect to his claim for disparate treatment based upon the denial of a TWL pay adjustment, the

Court concludes that Allen has failed to identify a similarly situated individual that was granted a

TWL pay adjustment. Though Allen does devote a considerable amount of briefing to identifying

"comparable employees" with respect to some of his other discrimination claims, he fails to

identify a comparable employee for this claim. (*See* Pl.'s Memo. in Opp. at 36-39).

### iii.     Pretext

Finally, even if Allen could set forth a *prima facie* case with respect to his claim for

disparate treatment based upon the denial of a TWL pay adjustment, Defendants would still be entitled to judgment on this claim because Allen has not met his burden to demonstrate that Defendant's legitimate proffered reason for denying the TWL pay adjustment is a mere pretext for discrimination.

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.*, quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997). In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision. *Smith*, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the adverse employment action. *Id.* The Court should not blindly accept the proffered reason as honest. *Id.* If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

In an attempt to demonstrate pretext, Allen relies on his argument that Ohio Administrative Code § 123: 1-37-07(A) entitled him to the TWL pay adjustment, which is an argument this Court has rejected. Even if the Court found that Ohio Administrative Code § 123:

1-37-07(A) and O.R.C. § 124.181(J) were ambiguous or permitted a TWL pay adjustment,

Defendants' incorrect interpretation of a statute does not demonstrate pretext. "Where the

employer can demonstrate an honest belief in its proffered reason, the inference of pretext is not

warranted." *Weimer v. Honda of America Mfg., Inc.,* 2009 WL 4795932, *6 (6th Cir. 2009),

citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). This is the "honest belief rule."

"Under the honest belief rule, an employer's proffered reason is considered honestly held where

the employer can establish it 'reasonably reli[ed] on particularized facts that were before it at the

time the decision was made.'" *Joostberns v. United Parcel Services, Inc.*, 2006 WL 41189, *6

(6th Cir. Jan. 9, 2006) (citing *Smith*, 155 F.3d at 806-07; *Majewski v. Automatic Data

Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).  As applied to the instant case,

Defendants have demonstrated that it reasonably relied on its belief that the duties being

performed and the relevant statutory provisions did not permit a TWL pay adjustment.

Accordingly, the Court finds that Allen has failed to demonstrate pretext, and consequently,

Defendants are entitled to judgment on this claim.

### (b)     2006 Denial of TWL Promotion

Allen alleges that in January 2006, he was denied a TWL to replace Garner in the Bureau

of Tax Credit on account of his race.  Defendants maintain that Allen fails to establish a *prima

facie* case of race discrimination with respect to this claim because: (1) denial of the TWL was not

an adverse action; (2) Allen has not established that he was considered for and denied the

position.  Finally, Defendants argue that even if a *prima facie* case is made, Allen cannot

demonstrate that its legitimate, non-discriminatory reason—that Allen was not more qualified than

the successful applicant, Alice Worrell—is a pretext for discrimination.

To state a *prima facie* case of race discrimination with respect to a failure to promote claim, Allen must demonstrate that (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) he was considered for and was denied the position; and (4) that an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied. *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005), citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63) (6th Cir. 2000).

### i.     Adverse Action

Defendants contend that the 2006 denial of a TWL "may not be an adverse action because a TWL does not constitute a promotion as a matter of law." In support of this contention, Defendants rely on *Ishler v. Weir* , 1980 Ohio App. LEXIS 10837 (10th Dist. 1980) for the proposition that a temporary assignment "by its nature does not give rise to any property or other interest of the employee in the job . . . ." *Id*. at 11-12. (Defs.' Mot. for Summ. J. at 33 n.7).

The Court disagrees and finds that the 2006 denial of a TWL amounts to an adverse action. The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Hollins*, 188 F.3d at 662. "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits,

suspensions, and other indicies unique to a particular situation." *Smith,* 378 F.3d at 575-76,

quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In the instant case, the

parties do not dispute that the successful TWL applicant would have received a significant pay

increase and would have a higher level of responsibilities. Accordingly, the Court concludes that

Allen has sufficiently demonstrated this element of his *prima facie* case.

### ii. Considered For and Denied the TWL Position

Defendants allege that Allen has failed to establish that he was actually considered for and

denied the TWL position. Allen alleges telling Demidovich that he was interested in the position,

but does not otherwise provide evidence that he was, in fact, considered for the position.

Demidovich, the decision-maker, indicates in his affidavit that: "Mr. Allen had discipline on file,

poor performance evaluations and was on a performance plan due to poor performance which all

factored against *further* consideration of him in a TWL." (emphasis added) (Demidovich Aff. ¶ 1).


Defendants argue that this language demonstrates that Allen was *not* considered. The

Court disagrees and instead concludes that when viewing the evidence in the light most favorably

to Allen, Allen's allegation that he expressed interest, combined with Demidovich's statement,

leads the Court to conclude that this prong of Allen's *prima facie* case is satisfied.

### iii. Similar Qualifications to Successful Applicant

Demidovich set forth his considerations and desired qualifications for filling the TWL

position:

I decided as the Deputy Director of Workforce Development that it was necessary to evaluate all the programs and staffing patterns of the Bureau of Tax Credits before determining if Mr. Garner's position would be replaced. This evaluation needed to be conducted very thoroughly and objectively. The programs within Tax Credits; Work Opportunity Tax Credits (WOTC) Welfare to Work (WTW), Migrant Seasonal Farm Workers, Ohio Training Tax Credits (OTTC) and Foreign Labor Certification (FLC) needed to be evaluated. These programs do not necessarily fit together. I wanted an objective person with extensive workforce development knowledge and experience for this assignment. This person would evaluate options and finally make recommendations on the future of this group as a single entity. This evaluation would include, in part, whether or not there was a need for a Bureau Chief level position, as well as, the fact that the OTTC program is scheduled to move to another agency per legislation in the near future.

(Demidovich Aff. ¶ 1). Demidovich also set forth the qualifications of the successful applicant,

Ms. Worrell:

Ms. Worrell understands the mission of the department and office. She has crafted performance measures, policies and directives. She understands regulations and uses this knowledge to ensure compliance to safeguard the office and department. She is an excellent researcher and problem solver. As an AA 4 to me, she is considered a subject matter expert and part of my management team. She understands and embraces my vision and direction for the office. Ms. Worrell is an effective and open communicator. She works well with staff at all levels and quickly gains employees' cooperation and respect. She has had above average performance evaluations consistently through the years and is an unclassified employee working at the pleasure of the Agency.

(Demidovich Aff. ¶ 1).

Allen, to support his contention that he was more qualified than Worrell to temporarily replace Garner as Bureau Chief, relies exclusively on his experience of heading the OTTC program for one year. The Court agrees with Defendants, that this single year of experience in the OTTC does not demonstrate that Allen was more qualified or even similarly qualified to Ms. Worrell, especially in light of the fact that the OTTC program—which was only one of several programs within tax credits—was scheduled to move to another agency. Specifically, Allen cannot claim that he had anywhere near 22 years state service, nor can he claim that he had

developed a reputation as an effective and open communicator, or that he worked well with staff at all levels, or that he earned above average performance evaluations consistently throughout the years. To the contrary, every supervisor Allen ever worked for at ODJFS—even Cain (Allen's African-American direct supervisor from 2001 through 2002)—indicate that they experienced difficulty working with Allen due to personality conflicts and also that he had communication problems.

Accordingly, this Court finds that Allen has failed to demonstrate the he was similarly qualified to Worrell, the successful TWL applicant. Accordingly, Allen cannot establish a *prima facie* case of disparate treatment in the denial of the TWL position.

### iv. Pretext

Finally, even if Allen could set forth a *prima facie* case with respect to his claim for disparate treatment based upon the denial the TWL position, Defendants would still be entitled to judgment on this claim because Allen has not met his burden to demonstrate that Defendant's legitimate proffered reason for denying the TWL pay adjustment is a pretext for discrimination. In an attempt to demonstrate pretext, Allen simply rehashes his argument that his one-year experience with OTTC made him more qualified than Worrell to temporarily replace Garner as Bureau Chief, which is an argument this Court has already rejected.

### (c) One-Day Suspension

Allen alleges that the one-day suspension he received in 2004 was on account of his race. Defendants maintain that Allen fails to establish a *prima facie* case of race discrimination with respect to this claim because he fails to identify similarly situated persons outside the protected class who were treated more favorably. Moreover, Defendants argue that even if a *prima facie*

case is made, Allen cannot demonstrate that its legitimate, non-discriminatory reason is a pretext for discrimination.

### i.    Similarly Situated

In his Memorandum in Opposition, Allen devotes significant attention to identifying "comparable employees." (*See* Pl.'s Memo. in Opp. at 36-39). Allen identifies several individuals—Jean Sickles, Jackie Beale, Cathy Maybriar, Dwight Garner, John Weber, Tom Hutter and Keith Wald—that he contends are similarly situated employees. Allen asserts that the last four listed individuals, who are all Bureau Chiefs, serve as comparable employees during the period he managed OTTC and maintains that the others listed are comparables because they "were supervised by Birnbrich, were subject to the same workplace standards, governed by the same ODJFS work rules and policies and performed very similar job duties and responsibilities as directed by Birnbrich." (*Id*. at 36). Allen concludes that "Plaintiff, like the comparables, performed his job duties and responsibilities." (*Id*. at 37).

Allen misapplies the "similarly situated" standard. Assuming, *arguendo*, that all of the individuals were similarly situated in the aspects of their employment that Allen has identified, that does not necessarily qualify them as "similarly situated" as that phrase understood in the *McDonnell Douglas* burden shifting paradigm.

To be deemed "similarly situated," the comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have *engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it*." (emphasis added) *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether an allegedly comparable employee is similarly

situated, the ultimate question is whether "all of the *relevant* aspects of [his] employment situation were 'nearly identical' to those of the [comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998); *Clayton v. Meijer*, 281 F.3d 605, 611 (6th Cir. 2002).

Allen fails to supply the Court with evidence demonstrating that any of the comparable employees he listed "engaged in the same conduct without differentiating or mitigating circumstances . . . ." *See Mitchell*, 964 F.2d at 577. Allen's statement that the alleged comparables "performed [their] job duties and responsibilities" undermines his ability to claim that they engaged in the same alleged conduct, *i.e.*, that they were insubordinate to their superior. In the disciplinary context, in order to be found to be similarly situated, the plaintiff and his proposed comparator must have engaged in acts of "comparable seriousness." *Clayton*, 281 F.3d at 611, citing *McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 283 n. 11 (1976). It is the plaintiff's burden to establish that the employee's acts were of "comparable seriousness" to his or her own infractions. *Warfield v. Lebanon Correctional Institution*, 181 F.3d 723 (6th Cir. 1999) (citation omitted). The absence of discipline, alone, is insufficient to show a *prima facie* case. *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008). Applied to the instant case, because Allen cannot demonstrate that anyone committed the insubordination he was charged with, he cannot establish a *prima facie* case of discrimination with respect to this disparate treatment claim.

### ii. Pretext

Defendants' legitimate, non-discriminatory justification for Allen's one-day suspension is that it was given in response to insubordination to Winegar. Allen does not dispute the fact that he refused to speak to Winegar. Instead, Allen contends that in refusing to speak to Winegar, he

was following Birnbrich's direction and concludes that this demonstrates that the only basis for his discipline was race. The Court does not agree—even viewed in the light most favorable to Allen, the evidence demonstrates that Birnbrich directed Allen and others to not involve Winegar in the daily operations of the OTTC program. Birnbrich did not direct Allen or others to be insubordinate, and as set forth above, Allen fails to identify anyone else who was insubordinate to Winegar and not punished. Accordingly, the Court finds that Allen has failed to carry his burden of demonstrating that the reason for his 1-day suspension was his race, and Defendants are therefore entitled to judgment on this disparate treatment claim.

### (d)    Ten-Day Suspension

Allen alleges that the ten-day suspension he received in May 2006 was on account of his race. Again, Defendants maintain, and the Court agrees, that Allen fails to establish a *prima facie* case of race discrimination with respect to this claim because he fails to identify similarly situated persons outside the protected class who were treated more favorably. Defendants further argue that even if a *prima facie* case is made, Allen cannot demonstrate that its legitimate, non-discriminatory reason is a pretext for discrimination.

### i.    Similarly Situated

Once again, Allen misapplies the "similarly situated" standard, failing to supply the court with individuals who engaged in the same alleged conduct, but were treated more favorably.

### ii.    Pretext

According to Defendants, Allen was issued the 10-day suspension as a result of two disciplinary hearings: one held in February 2006 and one on March 27, 2006. (Defs.' Mot. for Summ. J. at 40). Those meetings were the result of Allens alleged: refusal to comply with

instructions on various projects for which he was responsible, attempts to pass his responsibilities onto other individuals, feigning of ignorance about management's expectations of him, display of argumentative resistance with Birnbrich, refusal to respond to Birnbrich's follow-up emails on Allen's weekly reports, and refusal to acknowledge receipt of a counseling memorandum. (Defs.' Reply at 16). In the first pre-disciplinary hearing, Allen refused to comment or answer any questions without a representative present and did not enter any mitigating circumstances or information. In the second pre-disciplinary hearing, Allen read from a prepared statement, refusing to submit the statement to the officer despite acknowledging that the information would not otherwise be considered.

In his Memorandum in Opposition, Allen does not present evidence suggesting that he did not behave as described. (*See* Pl.'s Memo. in Opp. 48-50). Instead, Allen argues that he establishes pretext for three reasons. First, he claims that "the evidence is uncontroverted that plaintiff was suspended for ten (10) days for exercising his protected rights." (*Id.* at 49). Thus, Allen is claiming that the reasons proffered by Defendants for the suspension were a pretext for unlawful retaliation. The Court finds that Allen, in reaching this conclusion, mischaracterizes the evidence, but this is more properly addressed *infra* at Section III.A.2(b), where the Court addresses Allen's retaliation claims.

Second, Allen takes issue with the allegation by Defendants that he failed to clear up a misunderstanding as directed by his supervisor. (*Id.* at 50). Allen asserts that the allegation was not justified because he had resolved the communication difficulties. He cites to deposition testimony by Garner for support. The evidence demonstrates, however, that the confusion was not borne by all of the Bureau Chiefs, and the fact that Garner was not confused, does not require

the conclusion that Allen had cleared up the misunderstanding with all of the Bureau Chiefs. Further, even if the allegation was contrived by Birnbrich, Birnbrich was not the decision-maker with respect to the punishment, and Allen refused to comment or answer or enter mitigating circumstances at the first pre-disciplinary hearing and refused to submit a statement to the officer at the second. Moreover, this alleged incident was just one of several upon which the 10-day suspension was based.

Finally, Allen focuses on Defendants' alleged failure to follow its internal policies and rules, claiming that these alleged procedural deficiencies "put[] into question the truth of the reasons underlying the suspension." Allen does not cite to any particular policy provisions or policy language that was violated. Nor does he explain why such an alleged deviation would give rise to an inference of discrimination in the instant case. Thus, the Court finds that these arguments launched by Allen do not serve to undercut Defendants' legitimate, non-discriminatory reasons advanced for issuing Allen the 10-day suspension. Because Allen has failed to come forth with any other evidence showing that the discipline was motivated by racial animus rather than by the reasons advanced by Defendants, the Court finds that Defendants are entitled to judgment on this disparate treatment claim.

      **(e)**      **Poor Evaluations**

In May 2004, Allen received an evaluation that rated him "below target" in several areas, "above target" in others, but rated him overall as "satisfactory." (Allen Dep., Ex. G). In 2005, Allen received an "unsatisfactory" evaluation. (Allen Dep., Ex. LLL). Allen contends that these poor evaluations were based upon race in violation of Title VII. Defendants assert that Allen cannot maintain a disparate treatment claim with respect to the poor evaluations because: (1)

Allen cannot produce evidence demonstrating that the evaluations suffice as a "materially adverse employment action"; and (2) Allen fails to identify similarly situated persons outside the protected class who were treated more favorably. The Court agrees.

### i. Adverse Action

Allen, in a conclusory manner, states that the unsatisfactory evaluations led to "a materially adverse employment consequence" in the terms and conditions of Allen's employment and "affected Plaintiff economically." (Pl.'s Memo. in Opp. at 4). Defendants counter that Allen's 2004 "satisfactory" evaluation had no effect on any aspect of Allen's employment and cannot rise to the level of an adverse employment action. (Defs.' Mot. for Summ. J. at 33-34). Defendants further posit that for these same reasons, the 2005 evaluation cannot rise to the level of an adverse employment action, notwithstanding the alleged incidental affect on Demidovich's January 2006 selection of Alice Worrell to the TWL vacancy. (*Id.*). The Court agrees with Defendants.

"[A] plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim . . . under Title VII.**"** *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999). In *Hollins*, the plaintiff contended that her "lowered performance ratings" had an "effect on her wages," and consequently, the poor performance ratings constituted adverse actions under Title VII. 188 F.3d at 662. The Court concluded that plaintiff had not suffered an adverse employment action because she was unable to demonstrate that the "lowered performance ratings actually had an effect on her wages such that a court may conclude that there was a materially adverse employment action." *Id*. at 663.

Likewise, in *Primes*, the Court rejected the plaintiff's argument that his low evaluation constituted an adverse action. 190 F.3d at 767. The *Primes* Court explained:

> If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure. Paranoia in the workplace would replace the prima facie case as the basis for a Title VII cause of action. The case law supports our view that the employer conduct in this case will not support a Title VII cause of action. *See Yates v. Avco,* 819 F.2d 630, 638 (6th Cir. 1987) (plaintiff did not suffer adverse employment action, where demotion was in response to request for a transfer away from a harassing supervisor, salary and benefits were not reduced, and employee was assured that she would receive the next available position at higher grade); *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir. 1998) (if negative performance evaluation were deemed actionable as "retaliation," it would "send a message to employers that the slightest nudge or admonition ... can be the subject of a federal lawsuit"); *Rabinovitz v. Pena,* 89 F.3d 482, 488-89 (7th Cir. 1996) (low performance evaluation and consequent ineligibility for discretionary bonus not actionable adverse employment action); *Montandon v. Farmland Industries, Inc.,* 116 F.3d 355, 359 (8th Cir.1997) (lower performance evaluation not used as basis for any action against employee not "adverse employment action"); *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994) (same).

*Id*.

Applying the foregoing case law to the instant case, the Court finds that Allen's 2004 "satisfactory" evaluation and his 2005 "unsatisfactory" evaluation are not the type of adverse employment actions contemplated by Title VII. The Court is unpersuaded by Allen's unsupported speculation that he would have been awarded the TWL vacancy in January 2006 but for his poor evaluations. As this Court noted *supra*, Allen cannot even demonstrate that he was similarly qualified than the successful applicant, Alice Worrell, let alone more qualified. (*See* discussion *supra* at Section III.A.1.(b)(iii).

Accordingly, the Court concludes that Allen cannot state a *prima facie* case of discrimination with respect to the negative evaluations.

### ii.        Similarly Situated

As in the prior two claims, Allen again misapplies the "similarly situated" standard, failing to supply the court with individuals who engaged in the same alleged conduct, but were treated more favorably.  For this additional reason, the Court concludes that Allen cannot state a *prima facie* case of discrimination with respect to the negative evaluations.

### (f)        Continuous PIPs

In February 2005, Allen was placed on a performance improvement plan.  The PIP was either continued or renewed until Allen was terminated in October 2006.

Allen complains that his placement on a performance improvement plan was based upon race in violation of Title VII.  Defendants assert—as they did with the poor evaluation disparate treatment claim—that Allen cannot maintain a disparate treatment claim with respect to the imposition of the performance improvement plans because: (1) Allen cannot produce evidence demonstrating that placement on the PIPs suffice as "materially adverse employment actions"; and (2) Allen fails to identify similarly situated persons outside the protected class who were treated more favorably.  Again, the Court agrees with Defendants.

### i.        Adverse Action

Allen maintains that being placed on a PIP was an adverse employment action because "an employee cannot be promoted while on a performance improvement plan." (Pl.'s Memo. in Opp. at 43).  Defendants point out that Allen has "not established any evidence that being placed on a PIP is an absolute bar to a promotion" and that for support for his proposition, Allen relies exclusively on his self-serving affidavit. (Defs.' Reply at 4).  Defendants argue that case law does not support a finding that placement on a performance improvement plan constitutes an adverse

employment action. The Court agrees.

The Court has previously explained that to constitute an adverse employment action, there must be a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d at 575 (citation omitted). The Sixth Circuit has routinely found that the institution of performance improvement plans do not constitute adverse employment actions. *See e.g.*, *Bacon v. Honda of America Mfg., Inc.* 2006 WL 1973242, *5 (6th Cir. 2006) (noting that PIPs, "do not, on their own, generally qualify as adverse employment actions"), citing *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002); and *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999).

In the instant case, Allen fails to put forth evidence demonstrating that the PIPs materially and adversely changed the terms and conditions of his employment. The Court is unpersuaded by his self-serving affidavit that concludes, without any evidentiary support, that "ODJFS' workplace rules, policies and procedures provide that an employee cannot be promoted while on a performance plan." (Allen Aff. ¶ 61). *See Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (holding that self-serving affidavits without factual support in the record carry no weight on summary judgment). Other than denial of the TWL vacancy,[4] Allen fails to identify any promotions he was denied due to the imposition of the PIPs.

Accordingly, the Court concludes that Allen cannot state a *prima facie* case of discrimination with respect to being placed on PIPs.

_____

[4]Just as the Court was unpersuaded by Allen's unsupported speculation that he would have been awarded the TWL vacancy in January 2006 but for his poor evaluations, the Court is equally unpersuaded with Allen's allegations that he would have been awarded the TWL vacancy but for the PIPs. (*See* discussion *supra* at Section III.A.1.(b)(iii)).

### ii.     Similarly Situated

Allen, as he did in the prior disparate treatment claims, misapplies the "similarly situated" standard, failing to supply the court with individuals who engaged in the same alleged conduct, but were treated more favorably. For this additional reason, the Court concludes that Allen cannot state a *prima facie* case of discrimination with respect to the placement on PIPs.

### (g)     Termination.

Allen was terminated from ODJFS in October 2006. Allen alleges that his termination was based on race. Director Riley, in her October 2006 R.C. 124.34 Order of Removal, expresses that the reason for the removal was "Violation of the Employer's Disciplinary Policy, to wit: F1 (a) Refusal to carry out and/or follow directions, assignments, written policies, procedures, and/or work rules: F26 Violation of ORC 124.34." (Riley Aff. ¶ 7 and Ex. C). Defendants more specifically advance three reasons for Allen's termination: (1) the failure of WSM, which they attribute to Allen's failure to train staff; (2) Allen's leak to a customer; and (3) Allen's refusal to create an acceptable process plan. (Defs.' Mot. for Summ. J. at 40-41). Defendants allege that Allen's attempt at making out a *prima facie* case is once again deficient in that he fails to identify similarly situated individuals outside the protected class that were treated more favorably. Defendants further argue that even if a *prima facie* case is made, Allen cannot demonstrate that its legitimate, non-discriminatory reason for terminating him was a pretext for race discrimination.

### i.     Similarly Situated

With this disparate treatment claim based upon his termination, Allen continues his misapplication of the "similarly situated" standard, failing to supply the court with individuals who engaged in the same alleged conduct, but were treated more favorably.

### ii. Pretext

Allen seeks to demonstrate pretext by offering evidence that he did, in fact, create and submit a process plan for WSM and that he trained staff. (Pl.'s Memo. in Opp. at 51). Specifically, Allen claims that the affidavit testimony by Evangelina Collazo and Debbie Taylor, demonstrates that contrary to Defendants' assertions, Allen did train staff. Additionally, Allen disputes that there was a "leak" to a customer and alleges that he prepared the process plan on or about July 12, 2006. (Pl.'s Memo. in Opp. at 51; Allen Aff. ¶ 56).

In the instant case, Allen's attempt to demonstrate pretext falls short in two respects. *First*, the evidence presented by Allen is deficient. In her affidavit, Collazo states: "In my position as Planner III, I worked with Mr. Allen, who trained me and other co-workers. The training I received from Mr. Allen was better than all previous trainings that I received from other trainers." (Collazo Aff. ¶ 2). Collazo's affidavit is deficient in that she does not state the time frame or the subject matter of the training that she allegedly received from Allen. Similarly, Taylor, in her affidavit, states: "I worked with Plaintiff and he trained me and other staff members of One-Stop. Further, I worked with Plaintiff on Workforce Services Month." (Taylor Aff. ¶ 6). Like Collazo's affidavit, Taylor's affidavit is deficient in that it is too vague—it simply does not provide adequate support for Allen's contention that he trained anyone on the Workforce Services Month process plan. With respect to Allen's assertions that the communication was not a "leak," Defendants argue that Allen is engaging in a game of semantics. This Court agrees. The email chain dated August 8-9, 2006, speaks for itself. Despite repeated instructions from Birnbrich not to send internal emails to outside customers, Allen undisputedly copied Patricia Garrison, the Executive Director of Area 7 on internal communications regarding internal matters. (Allen Dep., Ex.

HHHHH).  Finally, Allen's allegations that he did, in fact, create a process plan for Workforce Services Month are also deficient.  Defendants do not dispute that Allen created a WSM plan.  Indeed, Defendants agree that Allen created a plan, but assert that it was so wanting in detail that upon Allen's refusal to appropriately modify the plan, Demidovich ordered Birnbrich to create the plan so that the project could move forward. (*See* Defs.' Mot. for Summ. J. at 29).

*Second*, even if the Court were to accept Defendant's assertions—that he properly trained the WSM staff, did not leak internal communications and created an acceptable WSM process plan—Allen's efforts to demonstrate pretext still fail because Allen did not present this information to ODJFS investigating individuals.  Despite being offered several opportunities to do so, Allen did not assert that he had, in fact, trained staff, at any point up to and including the investigatory phase of his disciplinary action.  For example, during Allen's August 11, 2006, Investigatory Interview, he was provided the following "advisement" by the interviewer:

> I wish to advise you that you must answer all questions relating to the performance of your duties, and/or fitness for duty.  You must answer all questions fully and truthfully.  Should you refuse to do so, you will be subject to departmental charges for failure to cooperate in the investigation and/or for dishonesty which could result in discipline.

(Birnbrich Dep., Ex. 20).  After being provided with this advisement, the interviewer made the following statement: "We would like to ask you some questions concerning the process plan and the training provided to staff for Workforce Services Month, as well as internal communications shared with outside entities." (*Id.*).  Then, the following questions were asked of Allen:

> Why did you not develop a process plan that was acceptable to your supervisor?
>
> After the Deputy Director directed your supervisor to complete the process plan for you, the Deputy Director directed you to 1) incorporate the supervisor's process plan into the overall plan and 2) train the necessary staff so that they understand the process for Workforce Services Month.  How did you incorporate

the process plan into the overall plan?

Who did you train?

When did you train the staff?

Why did you send internal OWD tracking information to Area 7 staff?

After your supervisor advised you on August 8, 2006 that sharing internal information was not appropriate, why did you send an internal email to Area 7 staff later the same day as the directive?

(*Id*.). Despite the advisement, to each of these questions, Allen's response was "No comment."

(*Id*.). Allen indicated for the first time during his deposition that he had trained staff. (Allen Dep.

494). Thus, Allen did not present contradictory or mitigating facts to the ODJFS decision-makers.

In order to demonstrate pretext, a "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants 'intentionally discriminated' against him. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001), citing *Woythal v. Tex-Tenn Corp*., 112 F.3d 243, 246-47 (6th Cir. 1997) (citations omitted). Further, in order to establish pretext, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite*, 258 F.3d at 493-94 (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998) (citation omitted). Here, Allen has failed to put forth evidence demonstrating that the ODJFS decision-makers did not "honestly believe" that Allen failed to train WSM staff, that he leaked internal communications, and that he failed to develop an acceptable WSM process plan. An independent investigatory interview and

two pre-disciplinary hearings were conducted in relation to the facts underlying Allen's termination, and it is undisputed that Allen did not once submit that he had, in fact, trained staff. The Sixth Circuit has stated: "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action." *Smith*, 155 F.3d at 807. *See also Wright v. Murray Guard*, 455 F.3d 702, 708 (6th Cir. 2006) (same); and *Balmer v. HCA, Inc.*, 423 F.3d 606, 614-15 (6th Cir. 2005) (same). In the instant case, the Court finds that Defendants made a reasonably informed and considered decision.

The Court concludes that Allen has failed to produce sufficient evidence from which a jury could reasonably reject Defendants' explanation and infer that the Defendants terminated Allen based upon his race. Accordingly, Defendants are entitled to judgement on this claim.

### 2.     Allen's Retaliation Claims

Allen asserts that a *prima facie* case of retaliation is easily established with respect to each of the following: (1) the poor evaluations, (2) the continuous PIPs, (3) the one-day suspension, (4) the ten-day suspension; and (5) his termination. (Pl.'s Memo. in Opp. at 56). Defendants maintain they are entitled to judgment in their favor on each of these alleged retaliation claims. The Court agrees.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII and § 1981 retaliation claims are analyzed under a variation of the burden-shifting framework set forth in *McDonnell Douglas*. *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 1951, 1960-61 (2008); *Johnson v. Univ. of Cincinnati*, 215

F.3d 561, 573 (6th Cir. 2000) (citation omitted). In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the defendant knew of this exercise of his protected rights; (3) the defendant consequently took an action that was "materially adverse" to the plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003); *see also Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action"). A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by showing he reasonably believed his activity was protected. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse action against the plaintiff. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). If the defendant comes forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination or retaliation. *Hicks*, 509 U.S. at 512 n. 4; *Burdine,* 450 U.S. at 253. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Burdine* 450 U.S. at 253.

In the instant case, Defendants contend that Allen fails to establish a *prima facie* case of

retaliation for each his alleged claims. The Court considers each alleged claim of retaliation in turn.

### (a)      The Poor Evaluations & the Performance Improvement Plans

Defendants maintain that Allen cannot establish a *prima facie* case of retaliation with respect to the poor evaluations and the PIPs because such actions are not materially adverse. In addition, with respect to the imposition of the PIPs, Defendants contend that Allen's *prima facie* case is deficient because Allen cannot establish the requisite causal connection and further because Allen cannot establish that ODJFS' Human Resources Department (who Defendants allege are responsible for the direction and approval for the form and content of the PIPs) knew about Allen's charges of discrimination or retaliation. (Defs.' Mot. for Summ. J. at 62-63). Similarly, Defendants assert that Allen's inability to demonstrate that Birnbrich knew that Allen participated in the Chief Inspector's investigation of Birnbrich or in the investigation of Terina Allen's discrimination complaints is fatal to his *prima facie* case of retaliation with respect to his 2004 evaluation. (*Id*. at 67). The Court agrees with Defendants that the poor evaluations and PIPs do not constitute materially adverse actions within the context of Title VII, and consequently, it is unnecessary to address Defendants' alternative arguments in support of summary judgment with respect to these claims.

The Court, in reaching the conclusion that the evaluations and PIPs do not constitute materially adverse actions within the context of Title VII, considered the standards set forth by the U.S. Supreme Court in *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006).

In *Burlington,* the Supreme Court resolved a long standing split in the circuits over the

appropriate standard for Title VII's anti-retaliation provision, which prohibits an employer from discriminating against an employee because that employee has engaged in activity protected by Title VII. Prior to *Burlington Northern*, many circuit courts, including the Sixth Circuit, applied the same standard for retaliation that they applied to a substantive discrimination offense when defining the "level of seriousness to which harm must rise before it becomes actionable retaliation." *Id*. at 2410; 2414.

In *Burlington Northern*, the Court recognized that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," and thus, the provisions "are not coterminous." *Id.* at 2412-2414. The Court rejected the Sixth Circuit's requirement that a Title VII plaintiff claiming retaliation demonstrate an adverse "employment" action. Instead, the Court adopted the less stringent standard utilized by Seventh and District of Columbia Circuits:

> In our view, a plaintiff must show that a reasonable employee would not have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Id*. at 2415, quoting *Rochon v. Gonzales*, 438 F.3d 1211, (D.C. Cir. 2006), quoting *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, (7th Cir. 2005).

Earlier, the Court found that the evaluations and PIPs did not constitute adverse employment actions for purposes of Allen's disparate treatment claims. (*See* Sections III.A.1.(e) and III.A.1.(f)). For many of the same reasons articulated in support of that finding, the Court finds that the evaluations and PIPs are not materially adverse, even under the less stringent *Burlington Northern* standard for retaliation claims.

In reaching this conclusion, the Court explicitly rejects Defendants' suggestion that the

Court should be persuaded by Allen's continual filing of complaints of discrimination. (*See* Defs.'

Memo. in Opp. at 58, stating: "With more than 13 complaints of discrimination and retaliation,

Allen seems hardly able to claim he was in any way chilled from engaging in protected activity.").

That Allen was not "chilled" from engaging in protected activity is not the standard. Instead, the

"standard for judging harm must be *objective*." *Burlington Northern*, 126 S.Ct. at 2415 (emphasis

added). The *Burlington Northern* Court explained the necessity for an objective standard: "It

avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a

plaintiff's unusual subjective feelings." *Id*. Thus, in reaching the conclusion that the at-issue

evaluations and PIPs are not materially adverse actions, the Court has relied on an objective

standard.

In sum, Allen cannot establish a *prima facie* case of retaliation with respect to the

evaluations and PIPs because they do not constitute materially adverse actions as contemplated by

Title VII, and consequently, Defendants are entitled to summary judgment on these claims.

### (b)      The One-Day and Ten-Day Suspensions & Allen's Termination

Defendants maintain that Allen cannot demonstrate a *prima facie* case of retaliation with

respect to the one-day and ten-day suspensions and Allen's termination because Allen cannot

establish the requisite causal connection between his protected activity and the suspensions.

(Defs.' Memo. in Opp. at 57-61). The Court agrees.

To establish the element of causation in a retaliation claim, a plaintiff "is required to

proffer evidence sufficient to raise the inference that his protected activity was the likely reason

for the adverse action." *EEOC v. Avery Dennison Corporation*, 104 F.3d 858, 861 (6th Cir.

1997) (quotation omitted). "[A]t the *prima facie* stage, the burden is minimal, requiring the

plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from the evidence, providing it is credible." *Id*. "Although no one factor is dispositive in establishing a causal connection . . . evidence that defendant treated the plaintiff differently than similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000).

Allen first attempts to establish the causal connection by stating in conclusory fashion that he "was treated differently than similarly situated employees." (Pl.'s Memo. in Opp. at 58). In his attempts to identify similarly situated individuals, Allen misapplies the "similarly situated" standard as he did with his disparate treatment claims by once again failing to supply the court with individuals who engaged in the same alleged conduct, but were treated more favorably or with evidence showing that he was treated differently from similarly-situated individuals who did not engage in protected activity.

Next, Allen seeks to rely on temporal proximity to establish the causal connection (Pl.'s Memo. in Opp. at 58-59). Defendants argue that under the circumstances in the instant case, Allen cannot rely on temporal proximity alone to establish the requisite causal connection. The Court agrees.

Mere temporal proximity is *ordinarily* insufficient, by itself, to raise an inference of a causal connection between the protected activity and the retaliatory act. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the

employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) *cert. denied*, 128 S.Ct. 366 (2007); *Randolph v. Ohi Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (noting that "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation"). Such additional evidence might include treatment different from that given to similarly situated employees who did not engage in protected activity or increased scrutiny after the plaintiff complained. *See e.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), *cert. denied*, 128 S.Ct. 1657 (2008); and *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that lapses of from two to five months between the plaintiff's EEOC charge and various disciplinary actions were insufficient to raise a *prima facie* retaliation claim).

Allen correctly notes, however, that closeness in time without more *can*, under certain circumstances, suffice to satisfy a *prima facie* case of retaliation. *See e.g.*, *Mickey v. Zeidler Tool & Die Company,* 516 F.3d 516 (6th Cir. 2008); *see also, Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004) (4-6 day interval was sufficient without more was sufficient to satisfy plaintiff's case of retaliation)*; Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (same day); *DeCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (13-day interval); *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (two-month interval); *Goller v. Ohio Department of Rehabilitation & Correction*, 2008 WL 2796080 (6th Cir. 2008) (two-month interval); *Sinfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three-month interval). Three months seems to be the outside limit. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (fact that Equal Employment Opportunity Commission issued right-to-

sue letter to employee three months before employee's supervisor announced she was contemplating employee's transfer was insufficient to establish causation element of retaliation claim); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four-month interval insufficient).

The evidence demonstrates that Director Riley was the ODJFS employee responsible for the imposition of the suspensions and Allen's termination. Allen concludes, "it is clear that Director Riley knew of Plaintiff's charges because on at least two (2) occasions, Plaintiff had informed her." (Pl.'s Memo. in Opp. at 64). The first such occasion Allen references involves an email sent in January 2005, which informs Director Riley that despite his repeated requests for a position description, Allen has not received one and has been told to stop asking for one. (Allen Aff., Ex. 1G). The Court finds that nothing in this email would put Riley on notice of Allen's protected activity. The second occasion Allen references involves an email sent in December 2005, which Allen begins: "I'm writing to raise your awareness about some very serious diversity issues in OWD. The Bureau of Civil Rights is aware of many issues." (Riley Aff., Ex. B). In this December 2005 email to Riley, Allen included an email chain between himself and Birnbrich in which he tells Birnbrich: "This is not a matter of performance, but of my race." (*Id.*). Though by December 2005, Allen had filed two charges with ODAS and two with OCRC, nothing in the December 2005 email informs Riley that he had done so. Director Riley responded to Allen: "I am aware that you have raised a number of issues that are under review. We will be diligent in assuring that the civil rights of all our staff are protected." (Allen Dep., Ex. VVVV).

The Court agrees with Allen that Riley had knowledge of Allen's protected activity by virtue of the December 2005 email, but the Court holds that Allen cannot solely rely on this email

to establish his *prima facie* case of retaliation. His reliance on this singular communication is inappropriate because too much time passed between the protected activity and adverse actions. The ten-day suspension was imposed in May 2006. The removal followed nearly ten months later.

Allen offers no case law suggesting that a lag of nearly five or ten months between protected activity and a materially adverse employment action is a brief enough period of time to establish an inference of causation. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that four month separation between protected activity and a job action may be a short enough duration to establish a causal connection); *see also*, *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 630 (6th Cir. 2008) (holding that nine months is too long a period to establish a causal connection). In the instant case, nearly four and a half months elapsed between Allen's complaint of discrimination to Riley and the ten-day suspension. In that time, Allen failed to follow a direct order to provide feedback to his supervisor on the SCOTI program, among other alleged violations. Thus, Allen's behaviors between December 2005 and May 2006 and the pre-disciplinary hearings, break the alleged temporal causal link. Further, Allen puts forth no evidence suggesting that Director Riley relied on anything other than the report from the Labor Relations officer to conclude that Allen's actions warranted discipline. (Riley Aff. ¶ 6). With respect to Allen's termination, Director Riley decided to remove Allen more than nine months after he complained in December 2005, and after there were more allegations of his non-performance, an investigatory interview with Allen and a second pre-disciplinary meeting. Under the circumstances of this case, this lapse of time is simply too great to establish causation.

Allen seeks to narrow the temporal gap by imputing Birnbrich's knowledge of Allen's

subsequent protected activity to Riley, arguing that it is improbable that Director Riley was unaware of Allen's subsequent protected activity. (Pl.'s Memo. in Opp. at 65). In order to impute knowledge of subsequent protected activity to Director Riley, Allen must offer proof (1) of prior interactions between Birnbrich and Director Riley; (2) that Birnbrich "in some capacity" contributed to the decision to punish the employee; or (3) that Director Riley has "some knowledge of the conduct allegedly giving rise to the retaliation." *See Hirsch v. Memphis City Schools* 2008 WL 4415165, *8 (W.D.Tenn. 2008); *Mulhal v. Ashcroft,* 287 F.3d 543, 553-54 (6th Cir. 2002); and *Cain v. Potter*, 2006 WL 3146435, *3 (N.D. Ohio 2006). Allen fails to provide evidence showing that Birnbrich ever discussed Allen's charges or complaints with Director Riley. Further, he has come forth with no evidence demonstrating that Birnbrich has contributed in some capacity to the decision to punish Allen. It is undisputed that Birnbrich reported to Purviance and Demidovich the various problems he had with Allen. The act of reporting problems, however, is different than determining whether and how an employee should be disciplined. Both parties have set forth ODJFS' three-tiered disciplinary process, whereby Purviance reports to Labor Relations the potential that an employee has violated a rule, and then Labor Relations conducts its own, completely independent pre-disciplinary hearing with the employee, making a neutral recommendation as to whether there is evidence to suggest that the employee has indeed violated the department's rules. (*See* Pl.'s Memo. in Opp. at 7; Defs.' Mot. for Summ. J. at 7-8). This recommendation, in the form of a Hearing Officer's Report, is then provided to the Director, who determines what discipline is appropriate under the circumstances. Based upon this multi-tiered disciplinary process, to show that Director Riley was influenced by Birnbrich, Allen must offer facts showing that the normal process was disregarded such that

Birnbrich was permitted influence over the decisions.  Allen makes no such showing.

Thus, the Court finds that Allen cannot rely on temporal proximity alone to establish a *prima facie* case of retaliation with regard to the suspensions and termination imposed by Director Riley.

Finally, unable to put forth evidence imputing Birnbrich's knowledge to Director Riley, Allen attempts to establish the requisite causal connections by arguing that Director Riley's actions are effectively a "rubber stamp." (*See* Pl.'s Memo. in Opp. at 64).  Allen provides no evidence in support of this contention other than his own speculation.  Allen failed to depose Director Riley to determine how rigorously she reviews the Labor Relations' reports regarding employee rule violations.  Regardless, to the extent Director Riley can be said to "rubber stamp" anything, it would be the conclusions reached by the Labor Relations through its independent pre-disciplinary hearing with Allen, in which neither Birnbrich, Purviance nor Demidovich are participants.  Although Allen initially describes the role Labor Relations plays in the process, in making the instant argument, he ignores its role, failing to offer any evidence that any person in Labor Relations had any knowledge of any of his protected activity.  As such, Allen cannot bridge the gap between Birnbrich's alleged retaliatory animus and Director Riley's imposition of the adverse actions.

In conclusion, Allen cannot demonstrate a *prima facie* case of retaliation with respect to the suspensions and his termination because he has failed to proffer evidence sufficient to raise the inference that his protected activity was the likely cause of the adverse actions.  Consequently, Defendants are entitled to summary judgment on these claims.

     **3.**      **Hostile Working Environment**

Allen alleges he was subject to a *racially* hostile working environment and a *retaliatory* hostile work environment while working at ODJFS. Defendants seek judgment in their favor on both claims. The Court finds that Defendants are entitled to summary judgment on Allen's *racially* hostile work environment claim, but not on Allen's *retaliatory* hostile work environment claim.

### (a) *Racially* Hostile Working Environment

Defendants argue that they are entitled to summary judgment on Allen's racially hostile work environment claim because the alleged harassment was neither objectively severe or pervasive, nor was it based on race. (Defs.' Mot. for Summ. J. at 44-45). The Court agrees that Allen has failed to demonstrate the alleged harassment was based on race.

"Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. (2002), citing *Faragher v. Boca Raton*, 524 U.S. 775, 786-787, and n. 1 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).

A plaintiff establishes a *prima facie* case of a racially hostile work environment by demonstrating that "(1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Armstrong v. Whirlpool Corp.*, 2010 WL 273691, *6 (6th Cir. 2010), citing *Barrett v. Whirlpool Co.*, 556 F.3d 502, 515 (6th Cir. 2009).

A hostile work environment occurs "[w]hen the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted); *Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999). Both an objective and a subjective test must be applied: the conduct must have been severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as having been abusive. *Harris*, 510 U.S. at 21-22. Isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment include:

1. the frequency of the discriminatory conduct;

2. the severity of the discriminatory conduct;

3. whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance;

4. whether the discriminatory conduct interferes with an employee's work performance; and

5. whether the plaintiff actually found the environment abusive.

*Harris*, 510 U.S. at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (reciting factors from *Harris*). "[T]he inquiry is not subject to any precise mathematical test." *Armstrong*, 2010 WL 273691 at *6, citing *Abeita v. Transamerica*, 159 F.3d 246, 251 (6th Cir.1998). The Supreme Court has explained:

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at 80. Properly applied, they

74

> will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . ." B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992) (hereinafter Lindeman & Kadue) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Allen lists the following examples of "unwelcome harassment . . . motivated by race . . ." that he alleges he was subjected to by Birnbrich and contribute to his racially hostile work environment:

1. unjustified poor evaluations;

2. numerous investigations and pre-disciplinary hearings;

3. closely scrutinizing all of Plaintiff's activities, to the point as has been described as "nit-picking" and requiring him to file weekly status reports;

4. placement on a 20-month performance plan where all Plaintiff's assignments were listed and Plaintiff was required to submit weekly status report[s], unlike other similarly situated employees;

5. continuous and excessive communication through email;

6. continuous violations of Defendants' rules and policies regarding discipline, including but not limited to the performance improvement plans;

7. denial of supervisory rights, such as access to necessary timekeeping records of Plaintiff's subordinates;

8. deliberate interference with military leave by unlawfully contacting Plaintiff's commanding officers at the Pentagon where he was assigned military duty, not just once, but two (2) times;

9. requiring Plaintiff to provide a doctor's excuse to return to work, despite the fact that Plaintiff had accumulated more than 100 hours of sick leave;

10.     denial of the TWL pay adjustments in 2005 and 2006;

11.     being assigned more work than other similarly situated employees;

12.     requirement to perform performance plan assignments, as well as his
regularly scheduled duties;

13.     suspensions and threats of termination;

14.     ultimately, being terminated unlawfully on October 20, 2006.

(Pl.'s Memo. in Opp. at 66-67).

There is no evidence in the record to suggest that any of Birnbrich's alleged conduct was committed "because of race."  For example, Allen makes no claims of intimidation, ridicule or insult by Defendants.  Further, he admits that he has never heard any of his supervisors make a racial slur or comment in or out of his presence.[5] (Allen Dep. at 443-46).  Rather, many of the alleged incidents appear to have been motivated entirely by Birnbrich's personal displeasure toward Allen, his work, and the complaints he had launched against him. "[P]ersonal conflict does not equate with discriminatory animus." *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 342-43 (6th Cir. 1998), *cert denied,* 525 U.S. 1106 (1999).  Therefore, the alleged harassing conduct, which has not been demonstrated to be based upon race, is not actionable as *racial* harassment under Title VII.  As discussed below, however, this conduct may constitute retaliatory harassment.

---

[5]Allen attempts to rely on conclusory statements made by Allen's co-workers and also hearsay testimony offered by Gerry Cain regarding an alleged racial slur made by Birnbrich.  On summary judgment, the Court should not consider conclusory statements or statements made without personal knowledge. *See, e.g., Reddy v. Good Samariton Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 958 (S.D. Ohio 2001) (Rice, J.).  Likewise, "[h]earsay evidence cannot be considered on a motion for summary judgment." *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994). Thus, in ruling on Defendants' Motion for Summary Judgment, the Court disregards all such inadmissible evidence.

### (b)     *Retaliatory* Hostile Work Environment

Defendants argue that they are entitled to summary judgment on Allen's retaliatory hostile work environment claim because (1) the alleged incidents that are materially adverse under *Burlington*—suspensions and termination—cannot be considered because Allen has failed to establish a *prima facie* case of retaliation with respect to those claims; and (2) several of the other alleged incidents of harassment are not materially adverse under *Burlington* and would not chill a reasonable employee from engaging in protected activity in the future. (Defs.' Mot. for Summ. J. at 44-45). Though the Court agrees that the suspensions and terminations should not be considered for purposes of Allen's retaliatory hostile environment claim (*see discussion, supra* at Section III.A.2(b)), the Court disagrees with Defendants' application of the standards for a claim of retaliatory hostile environment and also with their conclusions.

The Sixth Circuit has held that adverse actions that do not meet the *Burlington Northern* standard as "materially adverse actions," may still give rise to liability for retaliation under Title VII. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000). In *Morris*, the Sixth Circuit brought a Title VII action, claiming that she was subjected to sexual harassment and retaliatory harassment by her supervisor. *Id*. at 786. Prior to filing suit, Morris had filed a sexual harassment complaint against her supervisor. *Id.* Thereafter, Morris alleged that her supervisor began giving her the "cold shoulder" and became overly critical of her work. *Id.* After she further complained, she was transferred to another location, but her former supervisor continued to harass her at the new location. *Id.* Specifically, Morris alleged that the supervisor sat in his truck outside of her office and made faces at her; followed her home once, broke a television she used; and threw roofing nails on her home driveway. *Id.* The district court rejected her retaliation claim

because the plaintiff had not experienced a decrease in compensation, job title, level of responsibility or opportunity for promotion. *Id*. at 788. The Sixth Circuit reversed the district court, relying on the then newly-decided *Ellerth* and *Faragher* and the plain language of 42 U.S.C. § 2000e-2(a)(1), concluding that an adverse employment action is not the only type of retaliation cognizable under Title VII. *Id*. at 791. Rather, the Court explained that in the wake of *Ellerth* and *Faragher,* a claim for retaliatory harassment by a supervisor is actionable under a "hostile work environment theory."[6] *Id*.

In so holding, the *Morris* Court essentially modified the existing standard for proving a *prima facie* case for racial or sexual or racial hostile environment, stating that a plaintiff seeking to demonstrate a *prima facie* case of retaliatory hostile environment must prove that: (1) he engaged in an activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and harassment. *Id*. at 792 (citations omitted). The *Morris* Court also adopted the employer affirmative defense outlined in *Ellerth*:

---

[6] The Eleventh Circuit has explained the rationale behind permitting this type of retaliatory harassment claim:

> Our plain language interpretation of 42 U.S.C. § 2000e-3(a) is consistent with Title VII's remedial purpose. Permitting employers to discriminate against an employee who files a charge of discrimination so long as the retaliatory discrimination does not constitute an ultimate employment action, could stifle employees' willingness to file charges of discrimination.

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). Similarly, the Seventh Circuit has noted that "adverse actions can come in many shapes and sizes." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996).

The employer may also prove an affirmative defense to retaliatory harassment by a supervisor by demonstrating: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise."

*Id*. at 793, quoting *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257, 2270 (1998).

Defendants, in their Motion for Summary Judgment, misapply the standards set forth in *Morris* by considering each alleged incident of harassing behavior in isolation, concluding that each alleged incident is minor and would not chill a reasonable person from complaining about future discrimination. (Defs.' Mot. for Summ. J. at 62-67). Instead, pursuant to *Morris,* the Court considers all of the alleged incidents together to determine whether Allen was subjected to severe or pervasive retaliatory harassment by Birnbrich.

Applying this standard to the instant case, and assuming Allen's version of the facts, the Court finds that a reasonable juror could conclude that Birnbrich's behavior after Allen lodged complaints against Birnbrich constituted severe or pervasive retaliatory harassment.[7]

For example, Allen claims that Birnbrich began communicating with him only by email after he complained of discrimination. Further, Allen alleges that Birnbrich generally treated him

---

[7]Defendants do not contest any of the other elements of a *prima facie* case of retaliatory hostile work environment. Specifically, Defendants admit, and this Court agrees, that Allen's testimony regarding Birnbrich—that Birnbrich told him in August 2006 that he was going to continue his treatment of him until he stopped filing charges of discrimination and dropped his charges—"establishes, for purposes of summary judgment, a putative causal connection *with respect to Birnbrich* . . . ." (Defs.' Mot. for Summ. J. at 59) (citing Allen Dep. at 354-55). Defendants point out, however, that Allen neglected to mention this incident in any of his formal or informal complaints, first mentioning this alleged incident in his deposition testimony. Though this calls into question the credibility of Plaintiff's allegations, the Court, at this stage in the litigation, must refrain from making credibility determinations.

with hostility after his complaints.[8]  This is analogous to the claim the *Morris* Plaintiff made that

her employer gave her the "cold shoulder" after she complained of harassment.  Defendants admit

this is an "inconvenience" and that it "probably made the work environment tiresome," but

conclude "it is hard to imagine that the attitude chilled Allen."  Again, Defendants' statement

demonstrates that they incorrectly consider this event in isolation.

Allen also alleges that Birnbrich gave him lower-level assignments.  For example, Allen

notes that Birnbrich made him take notes at internal meetings in his absence, and he would not let

Allen delegate the responsibility.  Allen also cites the SCOTI Help-Desk Survey Project, in which

he had to call 50 employers and 50 job seekers every two weeks to gather data.  Though the

Court agrees with Defendants, that this assignment was within Allen's job classification, Allen and

testimony from Allen's coworkers make clear that this was certainly a less desirable assignment.


Allen's co-workers, Collazo and Clayborn, also offer testimony suggesting that Birnbrich

sought to disrupt Allen's work environment with his co-workers by asking them to take sides or

to not speak with Allen.  (Clayborn Aff. ¶ 6; Collazo Aff. ¶ 5).  Other ODJFS employees

corroborate Allen's claims that he was nit-picked by Birnbrich after engaging in protected

activity: "Nothing that Mr. Allen did would satisfy Mr. Birnbrich.  Anything that Mr. Allen did,

Mr. Birnbrich would find something wrong with it." (Collazo Aff. ¶ 3); "I personally witnessed

Mark Birnbrich begin threatening activity and closely scrutinizing Mr. Allen's work after Allen

---

[8]For example, Allen alleges he was continually subjected to threats of termination for failure to complete assignments.  Allen also notes an incident in which Birnbrich "startled" him by throwing the August 2006 PIP on his desk and threatening him with termination if he failed to sign it.

alleged discrimination." (Borelli Aff. ¶ 10); "I personally witnessed how Mark Birnbrich monitored and micromanaged the activities of Mr. Allen while refraining from exercising the same level of oversight and management over similarly situated Caucasian employees. Mark Birnbrich closely scrutinized every activity of Mr. Allen and found fault in whatever Mr. Allen did." "Mr. Birnbrich picked on Mr. Allen." "Mr. Birnbrich clearly picked on Mr. Allen regarding trivial matters." (Beale Aff. ¶¶ 5, 7, 12); and "Mr. Birnbrich would relentlessly pursue Plaintiff and nitpick at very minor things that Plaintiff attempted. Mr. Birnbrich would look for issues to complain to Plaintiff about. It seemed that it was impossible for Plaintiff to satisfy Mr. Birnbrich." (Taylor Aff. ¶ 3).

Allen also alleges that Birnbrich further contributed to his retaliatory hostile work environment by interferring with his military duty by calling his military commanders and threatening him with termination for requesting military leave. Allen further asserts that Birnbrich's request that he secure a doctor's verification of his illness after missing a single day, in light of the fact that he had over 100 hours of sick leave was in retaliation for his complaints of discrimination. Defendants defend Birnbrich's request by citing to ODJFS policy, but fail to include or examine the policy language. The policy cited has a specific explanation to the question "When is it appropriate to request PV [Physician's Verification]?" (Purviance Dep., Ex. 41). In response to this question, the policy provides:

> PV is requested to justify absences involving sick leave and/or leave in lieu of sick leave. *This is generally for isolated incidents of suspect, or potentially suspect usage, for extended absences or for chronic absences absent approved FMLA eligibility.* In cases where FMLA eligibility has been established, PV is usually unnecessary. There are, however, ceratin FMLA-related conditions that require regular (not isolated) PV as a condition of eligibility. Supervisors will be notified of such conditions and will need to monitor compliance. *Naturally, PV is not requested in an arbitrary or capricious manner.*

(*Id*.) (emphasis added). As Allen has noted, Birnbrich requested a physician's verification ("PV") after just a single day of absence, despite the fact that Allen had ample sick leave. Moreover, Defendants fail to identify for the Court what their basis for requesting a PV was, despite the policy's clear mandate that a PV will not be requested in an arbitrary and capricious manner. Accordingly, the Court will consider this incident as part of Allen's alleged retaliatory hostile environment claim.

Finally,[9] though the Court concluded that the evaluations and imposition of the PIPs did not constitute adverse employment actions or materially adverse actions for purposes of Allen's disparate treatment and retaliation claims, these alleged retaliatory acts are properly considered for purposes of Allen's retaliatory harassment claim. The Court agrees with Defendants, that they have stated legitimate, non-discriminatory and non-retaliatory reasons justifying various aspects of the negative evaluations and the imposition of the performance improvement plans. The Court

---

[9]Allen asserts that his retaliation claim is further supported by the fact that he was given a direct order by Demidovich to stop complaining of discrimination. (Pl.'s Memo. in Opp. at 20, 48). Allen cites the March 16, 2006 memo issued by Demidovich in support of this submission. The Court has reviewed this memo and finds that Allen has mischaracterized its contents. The memo states: "stop bantering back and forth with your supervisor and do your work. You are to apologize to Mr. Birnbrich immediately." (Allen Dep., Ex. TTTT). The Court views this language as advising Allen not to use claims of discrimination as an excuse to avoid doing his job, not as an order to cease engaging in protected activity.

Allen also submits, "[a]ccording to Penny Purviance, the Human Relations Liason, Plaintiff received the ten-day suspension for failing to stop complaining of discrimination as instructed by Deputy Director, Demidovich in a counseling memo." (*Id*. at 48). He cites to Purviance's deposition transcript for support, but the Court has reviewed the deposition in its entirety and has found no such testimony in which she makes or infers such a statement.

further finds that for significant portions of the negative evaluations and PIPs, Allen fails to demonstrate that Defendants' legitimate, non–discriminatory and non-retaliatory reasons are a pretext for retaliation. Allen has raised genuine issues of material fact, however, with respect to legitimacy of some aspects of the PIPs and evaluations. For example, in February 2005, Birnbrich placed Allen on a PIP, allegedly as a result of Allen's pervasive problems managing OTTC. Allen, however, has introduced ample evidence demonstrating that he had done a good job managing OTTC, including co-worker and supervisor accolades, and recognition by ODJFS of the success of OTTC on its list of quarterly accomplishments. Moreover, Allen alleges that he had not been warned of any performance issues with OTTC during the year he managed the program or at any time prior to being placed in the performance plan, nor had he been evaluated with respect to his work before being placed on the plan. Then, on Allen's May 2005 evaluation, which covered the eight months Allen had been temporarily assigned to OTTC and four months on the operations side, Allen was rated "below target" on the performance of his PIP and given an "unsatisfactory" evaluation in the face of this same evidence Allen has introduced, which contradicts the evaluation's conclusion that Allen's performance had been "unsatisfactory" over the past year.

In conclusion, Birnbrich's alleged behavior clearly constitutes more than simple teasing, offhand comments, and isolated incidents that *Faragher* indicated did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment. Therefore, the Court now considers whether or not Defendants have demonstrated an affirmative defense to Allen's retaliatory harassment by a supervisor claim.

As noted above, for claims of retaliatory hostile environment, the *Morris* Court adopted the employer affirmative defense outlined in *Faragher* and *Ellerth*. Thus, an employer must

demonstrate that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective measures. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 778. In the instant case, Defendants fail to make arguments in support of their entitlement to this defense, and instead, exclusively rely on their arguments that Allen cannot state a claim for a retaliatory hostile work environment. Accordingly, Defendants are not entitled to the *Faragher/Ellerth* affirmative defense, and Defendants are not entitled to judgment on Allen's retaliatory hostile work environment claim.

### 4. Claims against ODJFS under § 1981

Defendants argue that the Eleventh Amendment of the United States Constitution bars Allen's § 1981 claims against Defendant ODJFS. The Court agrees. *See e.g.*, *Hafford v. Seidner* 183 F.3d 506, 512 (6th Cir. 1999) (citations omitted); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000), *cert denied.*

### 5. Claims against Birnbrich in His Personal Capacity

Defendants contend that all Title VII claims asserted against Defendant Birnbrich in his personal capacity must be dismissed and that Defendant Birnbrich is entitled to qualified immunity with respect to some of Allen's § 1981 claims.

#### (a) Title VII Claims

The Court agrees with Defendants that all of the Title VII claims asserted against Defendant Birnbrich must be dismissed. "[A]n individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII. *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Supervisory employees are not typically

proper defendants under Title VII because they do not fall within the definition of "employer." "Employer" is defined to mean a person engaged in an industry affecting commerce who has fifteen or more employees and any agent of such person. 42 U.S.C. § 2000e(b). The Court finds that Defendant Birnbrich is not an "employer," and therefore, dismissal under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction is proper.

### (b)    § 1981 Claims

Only one of Allen's § 1981 claims of employment discrimination and retaliation remains pending—Allen's retaliatory hostile working environment claim—and the Court agrees with Defendants, that Defendant Birnbrich is entitled to qualified immunity with respect to this claim.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), the Court held that public officials are "entitled to [qualified] immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." The Court eliminated the subjective component formerly applied to determine qualified immunity, and established a test that turns on "the objective reasonableness of an official's conduct, as measured by deference to clearly established law." *Harlow*, 457 U.S. at 818.

Whether law is "clearly established" is normally determined with reference to the published decisions of the Supreme Court, the Sixth Circuit, or perhaps, the district court or state appellate court in the jurisdiction where the conduct occurred. *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171 (6th Cir. 1988).[10]  "[I]t is only in extraordinary cases that we can

---

[10]"Although decisions of other courts can clearly establish the law, such decisions must both point unmistakably to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his

look beyond Supreme Court and Sixth Circuit precedent to find clearly established law." *Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 964 (6th Cir. 2002), quoting *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993).

The fundamental inquiry is whether public officials are "'on notice their conduct is unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001). "'[I]n light of pre-existing law, the unlawfulness must be apparent.'" *Id*. Thus, as the Sixth Circuit stated in the First Amendment context in *Garvie v. Jackson*, 845 F.2d 647, 650 (6th Cir. 1988), "It is not determinative that the plaintiff has asserted the violation of a broadly stated general right." Rather, the Court explained:

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id*., quoting *Anderson v. Creighton*,107 S.Ct. 3034, 3038, (1987). *See also*, *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997) ("For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." (citations omitted)).

Turning to the instant case, the Court finds that this high threshold for surrendering qualified immunity has not been met. The Court agrees with Allen that it is undisputed that a

---

conduct was unconstitutional.'" *Mumford v. Zieba*, 4 F.3d 429, 432-33 (6th Cir. 1993); *Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir. 1992).

government agent may not retaliate against an employee for engaging in protected activity by creating a hostile work environment. What is not fully established by law, however, is whether the specific alleged actions taken by Birbrich against Allen amount to the creation of a retaliatory hostile work environment. *See e.g.*, *Cecil v. Louisville Water Co.*, 301 Fed.Appx. 490, 501, (6th Cir. 2008) and *Ford v. GMC*, 305 F. 3d 545, 554 (6th Cir. 2002) (holding that increasing an employee's work load or excessively scrutinizing his work might be an adverse action ); *Gaston v. ABX Air, Inc.*, 2007 WL 869728, *8 (S.D. Ohio) (Spiegel, J.) (holding that "nitpicking" may create a hostile work environment under certain circumstances); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000); *Ferguson v. Snow*, 185 Fed.Appx. 456 (6th Cir. 2006) (holding that "a non-promotion, an unsatisfactory job performance evaluation and a reprimand," all allegedly motivated by discriminatory animus, were not enough to support a hostile work environment claim); and *Brooks v. City of Springfield, Tenn.*, 2008 WL 2872277, *12 (M.D.Tenn. 2008) (requiring an employee to submit a doctor's excuse each time the employee called in sick could contribute to a hostile work environment). Therefore, the Court concludes that Birnbrich is entitled to qualified immunity with respect to Allen's retaliatory hostile work environment claim.

**B.  Allen's State Law Claims**

Defendants maintain that Allen's Ohio law claims against the State of Ohio are barred in this Court by sovereign immunity as embedded in the Eleventh Amendment. The Court agrees.

The Sixth Circuit has repeatedly and consistently held that the State of Ohio has not consented to be sued for state law claims in federal court. Rather, Ohio has consented to be sued in only one forum—the Ohio Court of Claims. *See Leaman v. Ohio Dep't of Mental Retardation*

& *Developmental Disabilities*, 825 F.2d 946, 954 (6th Cir. 1987) (en banc), *cert. denied*, 487

U.S. 1204 (1988); *State of Ohio v. Madeline Marie Nursing Homes*, 694 F.2d 449 (6th Cir.

1982). "[T]he fact that the state has waived immunity from suit in its own courts is not a

waiver of Eleventh Amendment immunity in the federal courts." *Johns v. Supreme Court of Ohio*,

753 F.2d 524, 527 (6th Cir. 1985), *cert. denied*, 474 U.S. 824 (1985), citing *Edelman v. Jordan*,

415 U.S. 651, 677 n.19 (1974).

Accordingly, Allen's state law claims against Defendant ODJFS are dismissed without

prejudice.

Defendants also maintain that Allen's Ohio law claims against Birnbrich are barred by

O.R.C. § 9.86. Again, the Court agrees. The language of O.R.C. § 9.86 states that the Court of

Claims of Ohio must first determine that individual immunity had been forfeited pursuant to

O.R.C. § 2743. *See e.g.*, *Haynes v. Marshall*, 887 F.2d 700, 704 (6th Cir. 1989)**.** Accordingly,

Allen's state law claims against Defendant Birnbrich are dismissed without prejudice.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN**

**PART** Defendants' Motion for Summary Judgment (Doc. 30).

Consistent with the foregoing, Plaintiff Allen's retaliatory hostile environment claims

remain pending against Defendant ODJFS, but are dismissed with prejudice against Defendant

Birnbrich. The remainder of Allen's employment discrimination and retaliation claims are

dismissed with prejudice. Allen's state law claims against Defendants are dismissed without

prejudice.

The Clerk shall remove Document 30 from the Court's pending motions list.

**IT IS SO ORDERED.**

 /s/ George C. Smith
**GEORGE C. SMITH, JUDGE
UNITED STATES DISTRICT COURT**